Michael MITCHELL et al., Plaintiffs,

v.

Royal UNTREINER, Individually and in his capacity as Sheriff of Escambia County, Florida, et al., Defendants.

No. PCA 75–145.

United States District Court,
N. D. Florida,
Pensacola Division.

Oct. 15, 1976.

James Ron Shelley, John W. Fleming, Office of the Public Defender, First Judicial Circuit of Florida, Pensacola, Fla., for plaintiffs.

R. H. Merritt, Pensacola, Fla., Jack H. Greenhut, Pensacola, Fla., for defendants.

ARNOW, District Judge.

This cause came on to be heard on motion for summary judgment filed by plaintiffs. At hearing before the court, counsel for all parties were in agreement there was no genuine issue respecting any material fact and that plaintiffs were entitled to the entry of summary final judgment as a matter of law. On the record here, the court so finds and holds.

They were also agreed that the record before the court established the Findings of Fact contained in this judgment, and that the Conclusions of Law contained herein also are proper. However, while plaintiffs consent, defendants do not consent, to the entry of this judgment.

The injunctive order here entered is to large extent the result of extensive conferences between counsel for the parties seeking to spell out an order requiring compliance with minimum constitutional require-

ments.* At hearing, all parties, when queried by the court, advised evidentiary hearing was neither needed nor requested by them and that the order here entered is reasonable and appropriate and might be entered by the court without taking any evidence in regard thereto.

This is an action brought by and on behalf of inmates of the Escambia County Jail, Pensacola, Florida seeking declaratory and injunctive relief from the unlawful conditions under which the inmates of the Escambia County Jail are confined.

The Sheriff of Escambia County, Florida, the Chief Jailer of the Escambia County Jail, and the members of the Board of County Commissioners of Escambia County are the defendants remaining in the suit at this time.

The action was brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1986; the United States Constitution; and the laws of the State of Florida. This court has jurisdiction under 28 U.S.C. §§ 1343(3)(4), providing for jurisdiction without regard to the amount in controversy in cases seeking redress from infringements of civil rights; under 28 U.S.C. §§ 2201 and 2202, providing for declaratory and injunctive relief; and under the court's pendent jurisdiction to hear claims arising under the laws of the State of Florida.

On January 26, 1976, this court entered an order allowing the cause to proceed as a class action with the class of plaintiffs divided into the following subclasses:

A. Subclass 1: shall include all those inmates, male and female, who are presently, or in the future, will be incarcerated in the Escambia County Jail awaiting trial;

B. Subclass 2: shall include all those inmates, male and female, who are presently, or in the future, will be incarcerated in the Escambia County Jail.

* Commendably, the attorneys for the parties, recognizing after completion of discovery that plaintiffs were entitled to relief, have worked together to fashion a judgment complying with legal requirements, yet, also, interfering to the least extent possible with the management and operation by defendants of their jail system. Their action in so doing has also, of course, saved a great deal of time and expense for the parties. Each of them has exhibited, in its full, true sense, zealous and able advocacy by the lawyer for the client.

## FINDINGS OF FACT

The Escambia County Jail (hereinafter "Jail") is located at 1700 West Leonard Street, Pensacola, Florida. The Jail is a detention facility for the pre-trial detention of persons awaiting trial on criminal charges in the Florida state and federal courts. The Jail further serves as a detention facility for convicted state and federal prisoners awaiting assignment and transfer to other institutions as well as for the confinement of miscellaneous convicted county prisoners. The Jail was constructed in 1954 and is operated as a maximum security facility.

There are 239 beds in the Jail exclusive of those in seclusion cells. Twenty-six of these beds are reserved for female prisoners. There are three seclusion cells, two each with one bed and one with two beds. There are forty-two sleeping cells of various sizes ranging in bed capacity from one to eighteen beds. The cramped floor space of the cells (which includes that space beneath the beds) varies from 8' x 8' dimensions in certain four bed cells to 24'7" x 16' dimensions in eighteen bed cells. Four of the larger sleeping cells in maximum security cell blocks S, T, W, X are also used as day rooms by inmates housed in those cell blocks. Cells with twelve or more beds each contain one shower, two commodes and two wash basins. Seclusion cells have a commode and a wash basin, but no shower. All other cells have a commode, a wash basin and one shower. There are neither hospital cells, nor recreation rooms, for the inmates.

Inmate population of the Jail frequently exceeds its maximum capacity. At the time of plaintiffs' complaint the inmate population was rarely less than 300 inmates. The inmate population has reached as high as 367.

Inmates have been crowded into cells with inadequate numbers of beds forcing inmates to sleep on dirty, bare concrete floors, sometimes without mattresses and other bedding. At the time plaintiffs' complaint was filed (October 16, 1975), plaintiff Mitchell, a fifteen year old juvenile male, had been since July 31, 1975, incarcerated awaiting trial with other juvenile males in a cell constructed to sleep three persons but which housed as many as eleven persons (ten immediately prior to the filing of plaintiffs' complaint). None of the persons in plaintiff Mitchell's cell had a mattress until immediately prior to the filing of plaintiffs' complaint, and all but three slept on the floor. Plaintiff Wagner, an eighteen year old adult male, against whom criminal charges were subsequently dropped, resided in a cell constructed to sleep twelve persons immediately prior to the filing of plaintiffs' complaint. Plaintiff Wagner slept on the dirty concrete floor without a mattress until the day immediately prior to the filing of plaintiffs' complaint One 8' x 8' four bed cell sometimes housed as many as six inmates necessitating that two of them sleep on the floor next to the toilet, sometimes without a mattress.

Inmates idly spend their entire days including mealtimes cramped in their cells without opportunity for outdoor recreation, fresh air or natural light. Only trustees, who are convicted male prisoners, are permitted to eat in a dining room. Neither females, nor pre-trial detainees, of either sex are permitted to be trustees. Opportunity for outdoor exercise is practically non-existent. As of June 4, 1976, inmates in only three cells were given outdoor exercise on one occasion during the second quarter of 1976. Inmates in six other cells last received any outdoor exercise during the first quarter of 1976. Inmates in many cells have received no outdoor exercise at all since the fall of 1975. Inmates in many cells have received no outdoor exercise at all since the exercise yard was opened on April 15, 1974. Opaque glass over the Jail's windows prevents inmates who are confined to their cells from even seeing outdoors. The Jail has "a lot of air conditioners with

compressors out and it is just as hot as it can be up there."

Inmates are assigned to particular cells without adequate classifications. Pre-trial detainees are not segregated from convicted felons and misdemeanants. There is no classification of inmates according to age other than to separate juveniles from adults. Unavailability of seclusion cells restricts the necessary segregation of sexual offenders and emotionally disturbed individuals, even when their conditions are known. There is no segregation of drug abusers or alcoholics.

Indigent inmates are not provided with the basic necessities of hygiene. Brushes, combs, toothpaste and razor blades are available only for purchase or when a chaplain (who is not a Sheriff's employee) becomes aware that a particular inmate does not have necessary toilet articles.

Indigent inmates are not given clothes other than those they wear when arrested. No provisions exist for allowing inmates to launder what clothing they do have.

Maintaining sanitation of the cells is left up to the inmates. Unclogging toilets and showers are also left up to the ingenuity of inmates. Conscientious inmates are permitted to sweep the floor daily and, upon information and belief, to mop the floor three times weekly. Upon information and belief bath soap is the only available cleanser for inmates to use on filthy walls, showers and toilets. Bath towels used by necessity, for cleaning the cells, are infrequently replaced. By defendants' answer to the complaint, "it is admitted that sanitation existing is not ideal and that considerable difficulty with toilets and showers is experienced from time to time but sanitation is maintained to the highest degree possible under the existing conditions of overcrowding and the age of the facilities". There is no janitorial maintenance of the Jail from noon Friday to Monday morning.

Mice and roaches are infested throughout the building of the Escambia County Jail. Inmates infested with hair lice are admitted to the Jail and placed in cells without being

inspected or queried for such infestations. The complaints of other inmates are sometimes necessary to bring to the attention of the Jail staff the infestation of the particular inmate.

The continuous operation of incandescent lights in corridors and plumbing vestibules and fluorescent lights in hallways and maximum security corridors inhibits restful sleep.

All inmates eat their meals in their cells, except for trustees who are convicted male prisoners and who are permitted to eat in a dining room on the first floor of the Jail. Most cells do not have dining tables, requiring inmates to eat on their bunks or on the floors.

The meal service to inmates is frequently delayed (sometimes as long as two hours after food is prepared) beyond the scheduled time for meals.

Inmate trustees sometimes serve the meals without supervision of the Jail staff. Meals are served in uniform quantities to all inmates regardless of the particular size of any of the inmates. The larger, stronger, more aggressive and forceful inmates sometimes take the food that has been served to the weaker inmates who are less able to defend themselves. It is uncertain whether the inmate trustees who serve these meals have health certificates from the Division of Health of the State of Florida. There is nothing to prevent inmates with infestation and disease from becoming trustees, unless their condition is obvious to the visual inspection of a jailer who has been designated to appoint trustees.

The service of meals within inmates' cells and the hoarding of foods by inmates greatly increases the problem of mice and roaches.

The Jail is entirely without medical, nursing, psychological, or dental staff on the premises. Jail personnel with only some first aid training arbitrarily decide whether inmates need medical treatment. In a letter from defendant Davis to defendant Untreiner dated February 25, 1974, the Chief Jailer candidly summarized his dilemma as follows: "Our problems consist of determining who is sick and who is not sick. The only way the Jail personnel can determine if an inmate is sick is if the inmate is bleeding, swelling, or has some physical problem that we can see. Any other complaint has to be verified by a doctor." No medical training has been given to the Jail staff since that time. Additionally, the inadequate number of Jail personnel jeopardizes the opportunity for inmates to seek medical care. In the event of a medical emergency, inmates are forced to call or shout to the officers on duty, their screams possibly not being heard. Defendant Davis testified at deposition, as follows:

QUESTION: "Well, in other words, if the prisoner screamed literally for his life, would your deputies be able to hear it if they were not up there on some matter of business concerning that cell?"

ANSWER: "We have a monitoring system which is not the best in the world and we hear screams and hollering and things continually. Possibly, no; only when the inmates get on the wall, so to speak, bang on the walls, would we know that a real commotion was going on, but in listening to this, there is so much, you know, chatter going on back and forth and beating the drums on the tables and on the walls and on the cups."

QUESTION: "So your monitoring system won't distinguish between the two?"

ANSWER: "Now, if somebody was hollering, 'help, save me,' something like this I imagine we would distinguish that from the ordinary noise that we hear."

No medical examination is made of inmates admitted to the Jail.

There are no medical facilities within the Jail. Inmates permitted to see a physician are taken to nearby University Hospital to see the county doctor during one hour clinics on Monday, Wednesday and Friday. Inmates unable to see the doctor during the clinic, are returned to the Jail and resched-

uled for a visit to the clinic on the next clinic day. An inmate may go as long as a week without medication for pain or infection before seeing the doctor, even if he has been scheduled to attend the clinic. The Jail provides no regular dental care for inmates. Inmates are transported to a dental clinic once a week. The dental clinic is sometimes cancelled or inmates are turned away unseen, weeks sometime going by without proper examination or medication for infection or pain.

A physician in attendance at the Jail is never provided. If an inmate's medical need is of an emergency nature and the Jail personnel recognizes it, the inmate is transported to the University Hospital, as overall understaffing permits.

No psychological or psychiatric treatment is available at the Jail. Various inmates thought to require constant supervision due to apparent mental illnesses, or other circumstances requiring supervision (e. g. homosexual tendency, drug withdrawal), are crowded in "Z" cell, a seclusion cell on the first floor of the Jail which presently has two beds but at the time of the filing of plaintiff's complaint had no beds. As many as four or five mentally disturbed inmates at a time are crowded into "Z" cell. There is no shower in "Z" cell. Violently ill inmates are likewise crowded into "Z" cell with other mentally disturbed inmates.

Visiting hours at the Jail are limited to brief periods on weekends. Inmates whose last names start with the letters A–M may receive visitors on Saturday afternoon from the hours of 2:00 to 4:00 and inmates whose last names begin with the letters N–Z may receive visitors on Sunday afternoon from the hours of 2:00 to 4:00. Who may visit an inmate is subject to the determination of Jail personnel, without published policy, regulation or Jail administrative review. Conversations must be conducted through tiny windows on the cell doors and in the presence of other inmates, visitors and Jail personnel. Inmates are not permitted to touch or kiss their spouse or other family members. Due to the overcrowding, visitors are sometimes turned away without visiting or are limited to extremely short visits. On the other hand, trustees are permitted to have contact visits while they work.

Attorney visits are conducted in inadequate facilities which are devoid of privacy. Attorneys may not visit their clients after the hour of 8:00 p. m. without special permission of the Sheriff or Captain Ambrose, although access is granted to investigating officers to procure confessions.

Inmates are not permitted to have radios, televisions or newspaper subscriptions.

Books and magazines are censored and denied to inmates without any written or defined standards applied to determine whether reading material is objectionable and without any list of what particular reading material is objectional.

The Jail is completely lacking of legal textbooks, case law, statutes or any other legal material with which inmates can exercise their constitutional right to represent themselves or even their right to lend legal assistance to counsel or independently ascertain the authenticity of their attorney's representation.

There are no educational or training programs in the Jail. There are no facilities or space in the Jail for such programs. The inmates have no recreational facilities other than the rarely used exercise yard. There is no employment program or work release program for pre-trial detainees to enable them to obtain the necessary money to pay their bill. There are no programs for rehabilitation or counseling program to enable them to improve their situation.

There are only three telephone lines (one of which is a pay telephone) in the Jail which are available for inmate use. These telephone lines are located in the Jail booking area and they are the only telephones available for incoming and outgoing telephone calls to jailers, other deputies in the Jail area, attorneys, visitors, bondsmen and all other people who pass through the Jail booking area. Inmates are given last priority for use of these telephones.

It is rare for most inmates of the Jail to have an opportunity to participate in organized religious services. Priority is given to women and old men to attend religious services which sometimes take place in one of the holding tanks of the Jail.

Inmates are disciplined by depriving entire cellblocks of outdoor recreation, telephone communication, visitation, mail and commissary privileges for the infractions of unknown individuals without ascertaining the individual inmate responsible for the infraction. Privileges are taken from inmates without a hearing before a disciplinary committee. The sole publication of disciplinary rules to inmates is as follows:

> DISCIPLINE: It is expected that all inmates observe the habit of good discipline.
>
> Disciplinary action will be taken against inmates, individually and collectively, for any acts detrimental to themselves, and/or other inmates, jail personnel and the jail building.
>
> These acts include self-injury, and injury to others, flooding of cells, breaking windows, refusing to comply with jail procedures in feeding, medication, cleaning, and any act contrary to good discipline and welfare of inmates and jail personnel.

There is an insufficient number of custodial officers in the Jail. The total number of personnel provided to operate the Jail and supervise the inmates is sixteen male personnel, including the Chief Jailer, and five female matrons. Eight men and one matron are assigned to the day shift. Four men and one matron are assigned to the evening shift. Three men and one matron are assigned to the midnight shift. However, absenteeism is high, sometimes cutting the staff in half. Personnel who are absent due to illnesses or vacations are not replaced during their absence.

The inadequate number of personnel jeopardizes the life and security of inmates and Jail personnel; hinders providing normal privileges to the inmates; hinders adequate visitation to the inmates; hinders adequate recreational opportunities to the inmates and hinders providing adequate medical care to the inmates.

There is no set number of times that Jail personnel are required to maintain visual supervision of the inmates. Defendant Davis could account for visual contact with the inmates only three times per day when meals are served and also when the cleanup crew goes by in the morning. There is no visual supervision of inmates' activities from 8:00 p. m. until morning. Inmates must bang on the wall with cups, shoes, etc., to gain the jailers' attention in the event of an emergency. Sometimes, even screams go unheeded due to the constant noise of the Jail. On May 19, 1976, defendant Davis estimated that ten or eleven sexual assaults by inmates upon other inmates resulted in criminal charges against them within three and one-half years. Between that date and the conclusion of defendant Davis' deposition of June 4, 1976, another arrest was made due to the repeated sexual assault of one inmate upon another.

The insufficient number of seclusion cells and the lack of procedures for determining whether inmates are mentally ill or violent prohibits separating some of the mentally ill and violent inmates from the remainder of the inmate population.

In marked contrast to living conditions in the Jail, is the Escambia County Road Camp which is a county operated institution for the detention of sentenced male prisoners. In contrast to the conditions of the confinement at the Jail, inmates at the Road Camp are furnished clothing if they are indigent; they get daily exercise; receive contact visits from family and friends; are permitted to receive newspapers in the mail; are permitted to attend religious services; and any inmate who has not completed high school is mandated to attend the educational programs provided through the auspices of Pensacola Junior College. None of the inmates of the Road Camp are pre-trial detainees or females.

Defendants named herein are responsible for the administration of the Jail and the care and custody of its inmates or have the power to alleviate the unlawful conditions

there but have not heretofore exercised that power.

Defendants named herein are adult citizens and residents of the United States and the State of Florida and at all times relevant hereto were acting under color of law, custom and usage of the State of Florida.

Defendant, Royal Untreiner, is the duly elected Sheriff of Escambia County, Florida, and as such is responsible for lawfully operating the Jail and providing lawful care and maintenance for the inmates thereof. Defendant Untreiner is also responsible for appointing and supervising the Chief Jailer of the Escambia County Sheriff's Department. Defendant Untreiner has visited the Jail on only one occasion to inspect a paint job.

Defendant, Odis Davis, is the duly appointed Chief Jailer of the Escambia County Sheriff's Department and as such is responsible for lawfully operating the Jail and providing lawful care and maintenance for the inmates thereof.

Defendants, Grady Albritton, Sam Armour, Kenneth Kelson, Jack Kenney and Zearl Lancaster, constitute the duly elected Board of County Commissioners of Escambia County, Florida, and as such are responsible for providing the lawful operation of the Jail and further are responsible for furnishing transportation and sums to discharged inmates of the Jail as required by Section 951.04 Florida Statutes.

## CONCLUSIONS OF LAW

■ The foregoing undisputed material facts describing the punitive and inhumane conditions of confinement within the Escambia County Jail clearly violate inmates' rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, as well as the laws of the State of Florida.

### A. GENERAL PRINCIPLES

■ Whether an inmate is detained in jail pending trial or under sentence he "retains all rights of an ordinary citizen except those expressly or by necessary implication, taken from him by law." *Jackson v. Godwin,* 400 F.2d 529, 532 (5th Cir. 1968), *quoting Coffin v. Reichard,* 143 F.2d 443, 445 (6th Cir. 1944). *See also Rhem v. Malcolm,* 371 F.Supp. 594, 622 (S.D.N.Y.1974), *affirmed and remanded* 507 F.2d 333 (2d Cir. 1974); *Sands v. Wainwright,* 357 F.Supp. 1062, 1094 (M.D.Fla.1973); *vacated on other grounds,* 491 F.2d 417 (5th Cir. 1974); *Washington v. Lee,* 263 F.Supp. 327, 331 (M.D.Ala.1966), *aff'd per curiam,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), "The courts have a duty to protect prisoners '. . . from unlawful and onerous treatment of a nature that, of itself, adds punitive measures to those legally meted out by the court.'" *Sands v. Wainwright, supra,* 357 F.Supp. 1094, *quoting Jackson v. Godwin,* 400 F.2d 529, 532 (5th Cir. 1968).

■ Pre-trial detainees who are incarcerated solely because they are too poor to afford bail ". . . retain all rights retained by arrestees who have been released on bail, except for the curtailment of mobility deemed necessary to secure attendance at trial and the limitations necessary to protect the security of the institution in which they are detained." *Inmates of Milwaukee County Jail v. Petersen,* 353 F.Supp. 1157, 1160 (E.D.Wis.1973). "Until adjudged guilty, every person charged with a crime or violation of municipal or county ordinance shall be entitled to release on reasonable bail with sufficient surety unless charged with a capital offense or an offense punishable by life imprisonment and the proof of guilt is evident or the presumption is great." Fla.Const. art. I, § 14. "The state's right to interfere with the personal liberty of pretrial detainees is much more limited than its interest in dealing with convicted prisoners. The concept of the least restrictive form of incarceration consonant with the accused's being available for trial is inherent in jail prior to trial. It is a constitutional corollary of the constitutional right to bail." *Wilson v. Beame,* 380 F.Supp. 1232, 1236 (E.D.N.Y.1974).

Perhaps the best statement of the basic principles is the following quote:

It is a fundamental tenet of the American criminal system that a person is presumed innocent until proven guilty; he is not to be punished before he is tried and convicted of a crime. This applies as strongly to pretrial detainees as bailees and those who have not been accused of a crime. Accordingly, if the restrictive conditions under which detainees are held constitute punishment, subjecting detainees to those conditions violates the due process of law guaranteed by the Fifth and Fourteenth Amendments and the proscription against cruel and unusual punishment of the Eighth Amendment.

*Miller v. Carson, supra,* 401 F.Supp. 835 at 867 (Fla.) *quoting Note,* "Constitutional Limitations on the Conditions of Pretrial Detention," 79 Yale Law Journal 941 (1970).

Earlier vintages of precedent support the foregoing principles:

Upon the whole, if the offense be not bailable, or the party cannot find bail, he is to be committed to the county goal . . . there to abide till delivered by due course of law. . . . But this imprisonment, as has been said, is only for safe custody, not for punishment: Therefore, in this dubious interval between the commitment and the trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only.

*Miller v. Carson, supra,* 401 F.Supp. 835 at 867 (Fla.) quoting 4 *Blackstone Commentaries* 300.

The courts' application of these principles have not failed to consider the government's duty to insure the appearance of an accused at trial:

. . . [E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that . . . when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.

*Shelton v. Tucker,* 364 U.S. 479, 488; 81 S.Ct. 247, 252; 5 L.Ed.2d 231 (1960).

But no government's purpose can justify the punishment presently being suffered by the inmates of the Escambia County Jail. Finding similarly egregious conditions of confinement in the Hall of Justice in the City of Los Angeles, Judge Gray, in *Dillard v. Pitchess,* 399 F.Supp. 1225, 1233 (C.D.Calif.1975), graphically stated:

Any deprivation of liberty is, of course, very substantial punishment. But the punishment imposed upon a man by confining him in the Hall of Justice jail in order to insure his presence at trial is far more onerous than the legitimate purpose of such confinement can justify. Nothing in such purpose requires or justifies that a man be forced to spend substantially all of his time in one of the drab and dismal cells described earlier in this memorandum, virtually without recreation, diversion or entertainment; where the depressing monotony is not broken by a change of setting even at meal time and where he sleeps and eats in immediate proximity to the toilet, necessarily in the hope that his cellmate's digestive system will remain reasonably regular and subdued.

■ The overcrowding, unsanitary conditions, non-hygenic toilet facilities, lack of light and fresh air, the inadequate medical care, and inadequate staff necessary to insure inmate safety and the lack of recreational, educational opportunities present in the Escambia County Jail are so extreme as to constitute punishment without the due process of law guaranteed to each citizen by the Fifth and Fourteenth Amendments to the United States Constitution and the infliction of punishment which is both cruel and unusual, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

An examination of the findings of other courts considering claims of unconstitutional conditions within jails and prisons will lead this Court to the conclusion that the living conditions in the Escambia County Jail are as severe as in any American insti-

tution. In the often cited *Rhem v. Malcom,* 371 F.Supp. 594 (S.D.N.Y.1974), *affirmed* 507 F.2d 333 (2d Cir. 1974), the District Court described the Manhattan House of Detention for Men (the "Tombs") in a manner which inmates in the Escambia County Jail would find comparably enviable. The weekly outdoor exercise opportunities and the opportunities for booth visits twice and perhaps three times per week, *though* condemned by the Court as woefully inadequate, far surpass the "privileges" permitted at the Escambia County Jail. See also *Dillard v. Pitchess,* 399 F.Supp. 1225 (C.D. Calif.1975); *Miller v. Carson,* 401 F.Supp. 835 (M.D.Fla. 1976), *appeal pending; Jones v. Wittenberg,* 323 F.Supp. 93 (N.D.Ohio 1971); *affirmed, sub nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972).

The deprivation of basic human needs for housing, food and medical care is not merely unnecessarily cruel and unusual, but is calculated to retard, if not prevent, the process of a prisoner's rehabilitation. *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss.1972), affirmed 501 F.2d 1291 (5th Cir. 1974). Inmates' minimal communication with the outside world render them helpless to secure the basic necessities of civilized human existence.

 Inmates of the Escambia County Jail are being denied the equal protection of the laws guaranteed to them by the Fourteenth Amendment to the United States Constitution. By the mere coincidence of their location or their sex they are denied contact visitation and regular outdoor exercise, the opportunity to subscribe to a newspaper, to watch television, and to contribute to their educational advancement, all of which are provided to convicted male prisoners at the Escambia County Road Camp. Without regard to any meaningful security classification system, pre-trial detainees are denied the relative freedom of trustees who are all convicted male prisoners but who are regularly permitted to leave their cells, exercise, have access to the telephones, have contact visits, eat hot meals in a dining room and, incidentally, decrease the risk of vermin and rodent infestation in their own cells, watch television and otherwise avoid the forced idleness in overcrowded and unsanitary cells, which all other inmates suffer. Female inmates are doubly denied equal protection of the laws by not being permitted to be trustees even if they are convicted and by not being permitted to serve their sentences in a less severe facility as is available to male prisoners at the Escambia County Road Prison; and it is abundantly clear that pre-trial detainees who are too poor to make bail suffer more than is necessitated by the government's justification that they must be detained to insure their appearance at trial. They are consequently denied the protection that the legal presumption of innocence guaranteed to arrestees who are able to afford bail and await trial as presumedly free and innocent persons.

 Inmates of the Escambia County Jail are denied their First Amendment rights. The lack of reasonable opportunity for most inmates to exercise their religious freedom is not countenanced by valid security considerations. The essentially non-existent system of classification does not distinguish those inmates who are too dangerous to be permitted to walk to the chapel (if there was one) from those inmates who would presumably be permitted to worship if the defendants provided adequate facilities and staff for the exercise of religious as well as other constitutional rights. The arbitrary and capricious limitations placed upon access to families and friends, and the failure to permit inmates to read even a daily newspaper deny them other First Amendment freedoms of speech, association, and the right to be informed citizens in a democratic society.

 Arbitrary and summary discipline by taking of "privileges" from entire cells of inmates without notice and without any opportunity for inmates to be heard denies to inmates of the Escambia County Jail the due process of law guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

 The lack of access to a library, the complete absence of any law books, and

restrictions on visiting and mailing privileges, deprive the inmates of the Escambia County Jail of effective assistancè of counsel, the ability to assist in the preparation of a defense and to secure witnesses in their behalf, all in violation of their rights under the Sixth and Fourteenth Amendments to the Constitution of the United States.

 The totality of the circumstance of confinement within the Escambia County Jail and the sub-human level of existence imposed there violates all civilized concepts of human rights.

## B. PROFESSIONAL STANDARDS OF DETENTION

Experts retained by defendant commissioners to study the present and future requirements of Escambia County Jail facilities reached similar findings and conclusions. See SUA Incorporated, *Interim Report to Escambia County, Florida* (April 26, 1976). (Hereinafter "SUA Report").

The SUA Report systematically researches and examines the Escambia County population and crime trends and its compilation of correctional professional standards for detention facilities is highly critical of the Escambia County Jail's inadequate classification system, unhealthful environment, and inadequate health services, SUA Report 4:74–76. It is likewise critical of the Jail's lack of general and legal library facilities, SUA Report 4:26, 35, very poor visitation procedure and minimal use of telephones by inmates, SUA Report 4:33, non-existent recreational opportunities, SUA Report 4:55, lack of due process in disciplining inmates, SUA Report 4:46, and the lack of a chapel and interview rooms for consultation and counselling, SUA Report 4:42. Despite these numerous deficiencies, excused in the name of institutional security, the vulnerability of the Jail's security is apparent, SUA Report 4:18–20.

## C. LACK OF RESOURCES NOT A JUSTIFICATION FOR DEPRIVATION OF CONSTITUTIONAL RIGHTS

 Defendants Untreiner and Davis and members of the Board of County Com-

missioners have offered no affirmative defense, except to answer that overcrowding, inadequate staff, and the poor condition of the Escambia County Jail make their duties difficult. The lack of financial resources seems to be the defendants' only explanation for permitting the Jail to continue to operate in an unjustifiable fashion. It can be succinctly stated that "[l]ack of funds is not an acceptable excuse for unconstitutional conditions of incarceration," *Finney v. Arkansas Board of Correction,* 505 F.2d 194, 201 (8th Cir. 1974).

The Fifth Circuit Court of Appeals most clearly expresses this principle in the following excerpt from *Gates v. Collier,* 501 F.2d 1291, 1319 (5th Cir. 1974):

> Where state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts. In *Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir. 1971), an installment of the Arkansas prison litigation, the district court stated:
>
> > 'Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. *If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.*' 309 F.Supp. at 385. (Emphasis in original).

*See Watson v. City of Memphis,* 373 U.S. 526, 537, 83 S.Ct. 1314, 1321, 10 L.Ed.2d 529 (1963) ('. . . vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny [them] than to afford them.' —desegregation of public parks); *Rozecki v. Gaughan,* 459 F.2d 6, 8 (1st Cir. 1972) ('Humane considerations

and constitutional requirements are not, in this day, to be measured or limited by dollar considerations.' —prison heating system); *Jackson v. Bishop,* 404 F.2d 571, 580 (8th Cir. 1968) ('Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . .' —rehabilitative devices); *Hamilton v. Love,* 328 F.Supp. 1182, 1194 (E.D.Ark.1971) ('Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights.' —pre-trial detention unit). On the contrary, appellants cite no cases in support of their contention that the relief fashioned by the trial court cannot be granted.

It seems that the most onerous aspect of the district court's judgment, as far as the State of Mississippi is concerned, is that compliance will cost the State a considerable amount of money. *But the district court did not require that the legislature appropriate monies for prison reform; it simply held, in keeping with a plethora of precedent on the fund shortage problem, that if the State chooses to run a prison it must do so without depriving inmates of the rights guaranteed to them by the federal constitution.* (Emphasis in original)

\*　\*　\*　\*　\*　\*

Therefore, we cannot agree that the relief here granted was impermissible. Having found these numerous constitutional violations, which were even conceded by the appellants, the court had the duty and obligation to fashion effective relief. In such circumstances, the trial court is allowed wide discretion. 'Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.' *Swann v. Board of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). The relief ordered by the trial court was tailored to alleviate the deplorable practices and conditions at Parchman. Shortage of funds is not a justification for continuing to deny citizens their constitutional rights.

Paraphrasing *Gates v. Collier, supra,* ". . . if [Escambia County] chooses to run a [jail] it must do so without depriving inmates of the rights guaranteed to them by the federal constitution." 501 F.2d at 1320.

## REMEDIES

Recognizing the substandard living conditions in the Escambia County Jail is much more easy a task than is fashioning a remedy which both meets the minimal constitutional standards and respects the authority of state and local administrators to operate their own facilities. This Court is reluctant to interfere with such administration, and it intercedes now only because the paramount constitutional and statutory rights of plaintiffs and the classes and subclasses they represent supervene. The defendants have had ample opportunity to modify their operations of the Jail, but they have declined the initiative. This Court will not so decline. It is therefore

## ORDER AND ADJUDGED:

That the aforesaid defendants and the successors, agents, servants, and employees of each of said defendants, in order to accomplish the foregoing, shall immediately and permanently operate and maintain the Escambia County Jail in compliance with the following:

## INMATE CARE AND CELL MAINTENANCE

1. Clean blankets, sheets, pillows, pillowcases, towels and washcloths shall be issued to inmates within 8 hours of being booked and shall be frequently laundered.

2. Each inmate who does not have sufficient money when he enters the Jail or has not obtained sufficient money from family and friends shall be furnished, without charge, within 24 hours of being booked: Soap, toothbrush, toothpaste, and suitable comb so as to be able to maintain good personal hygiene. Shaving gear shall be available for inmates, without charge, within 24 hours of being booked.

3. Each inmate who does not bring adequate clothing when entering the Jail, or has not had the same furnished by family or friends, shall be furnished the same free of charge within eight hours of being booked. Within 120 days from the date hereof, a report shall be submitted to this Court setting forth details with respect to the feasibility and desirability of providing all inmates housed for a period longer than eight hours with uniforms made of wash and wear materials, underwear, socks and sandal-type footgear.

4. Inmates shall have available a daily change of clean clothes.

5. An organized and supervised program of daily cleaning shall be instituted, including mopping, scrubbing, wall washing, etc., which will insure that all housing cells are cleaned on a daily basis. Proper sanitizers in adequate quantities shall be furnished and each cellblock shall be furnished with clean mop water with proper sanitizers added on a daily basis. Within 60 days from the date hereof a report shall be submitted to this Court which includes the details of the program of daily cleaning.

6. All necessary steps to rid the Escambia County Jail of insects and vermin shall be continued.

7. Steps shall be taken to acquire the services of a qualified person in the field of institutional lighting. Within 90 days from the date hereof a report of said person shall be submitted to this Court setting forth details for eliminating the problems described in said person's initial report. All opaque paint shall be removed from the Jail windows except from the bottom panes on the front of the building within 30 days.

8. Steps shall be taken to acquire the services of a qualified person in the field of ventilation and temperature control. Commencing January 1, 1977, and on a quarterly basis thereafter, a report of a qualified person in the field of ventilation and temperature control shall be filed with Court reflecting said person's opinion as to the continued adequacy of the ventilation and temperature control system throughout the Escambia County Jail. Immediate steps shall be taken to comply with all reasonable recommendations of said person in said report.

9. All plumbing fixtures which are presently inoperable or malfunctioning shall be forthwith repaired. An organized and supervised program for the maintenance of the equipment and facilities existing in the Escambia County Jail, including plumbing fixtures, shall be instituted. Within 90 days from the date hereof, a report shall be submitted to this Court indicating compliance with this paragraph.

10. All inmates shall be furnished with adequate table space for taking meals at mealtime.

11. Each cell shall be furnished with a mirror for the purpose of shaving and personal hygiene.

12. No inmate shall be housed in cells which do not have showers except isolation cells. Those inmates housed in isolation cells or cells without working showers shall be given an opportunity to shower at least five times a week.

13. Each inmate shall be furnished with a space or locker for properly storing personal items including clothing. Within 90 days from the date hereof, a report will be submitted to this Court indicating what steps have been taken to comply with the requirements of this paragraph.

### OVERCROWDING

1. All inmates shall be furnished a bed for sleeping purposes if held overnight. Bedding shall comply with Rule 10D-7.-07(3), Rules of the Department of Health and Rehabilitative Services, State of Florida.

2. The number of inmates in the Jail shall not exceed 239 inmates on a normal daily basis. No more than 213 inmates may be males. Female inmates shall not exceed 26 in number. No cell or cellblock shall contain more inmates than the number for which the various cells or cellblocks were constructed.

3. In the event that an emergency requires that the inmate population exceed the normal limits set forth in paragraph 2 above, it may not so exceed said limits for more than 48 hours and under no circumstances may the population exceed 250 inmates. Within one year of the entry of this order, the population may under no circumstances exceed the limits set forth in paragraph 2 above. The defendants are expected to carry out in good faith the spirit and intent of this order to refrain the inmate population from exceeding the normal limits of the Jail's capacity as well as in all other respects.

4. Commencing January 1, 1977, a quarterly report shall be submitted to this Court which includes a recital of any and all existing plans or proposals not heretofore reported to this Court with respect to the construction of additional correctional institutions in Escambia County, Florida.

4A. Nothing in this section of this order, or any other portion of the order, shall require compliance with any provisions of this order by any defendant that cannot be accomplished by such defendant without violation of any law of Florida.

5. Commencing January 1, 1977, and continuing quarterly thereafter, a report shall be submitted to this Court stating by offense the number of individuals booked into the Escambia County Jail during the preceding quarter.

## CLASSIFICATION SYSTEM

1. No juvenile shall be housed in the Escambia County Jail at any time unless the housing of juveniles in the Jail complies with the applicable provisions of Chapter 39 of the Florida Statutes. As used in this paragraph, juvenile means a child as defined in Chapter 39, Florida Statutes.

2. No pre-trial detainees shall be housed in the same cell with any person convicted of a crime.

3. A plan shall be immediately instituted requiring a procedure for the confinement of inmates by classification providing, whenever possible, for classifications which separate males from females, felons from misdemeanants, and, in addition, providing for the separation of unusual prisoners, such as the mentally ill, alcoholic or narcotic addicts, sex deviates, suicide risks, and any other classification which defendants may deem necessary for the safety of the inmates and the operation of the Jail. Within 60 days from the date hereof, a report shall be submitted to this Court setting forth what steps have been taken to provide for the separation of unusual prisoners as heretofore described. Said report shall also state what problems, if any, are being encountered with respect to complying with the provisions of this paragraph.

## DUE PROCESS IN JAIL DISCIPLINE

Procedures for insuring due process in jail disciplinary proceedings shall be immediately instituted. Said procedures shall, at a minimum, comply with Rule 10B–17(13), Rules of the Department of Health and Rehabilitative Services Division of Corrections. Within 60 days from the date hereof, a report shall be submitted to this Court showing compliance with this paragraph and showing notice to the inmate population of the adoption of said procedures.

## MEDICAL FACILITIES AND TREATMENT

1. *Immediate* steps shall be taken as are necessary to obtain a satisfactory arrangement including a written contract of health services providing for the admission, treatment, and diagnosis of inmates on both a consultative and an emergency basis.

2. *Immediate* steps shall be taken as are necessary to obtain the services of a physician on call at the Jail or at an appropriate medical facility 24 hours a day, seven days a week, 52 weeks a year.

3. *Immediate* steps shall be taken to institute an efficient communication system for the purpose of insuring that inmates are able to notify a member of the medical staff of the need for medical assistance. Said information shall be posted in the catwalk area outside each cellblock. This com-

munication system shall require that a member of the medical staff immediately be notified of any inmate's health complaint and the nature of said complaint, that the member of the medical staff either immediately consult with a physician to determine the treatment for the inmate if the inmate's complaint is of an emergency nature or submit a report to a physician and insure that the inmate is examined by a physician within 24 hours of the inmate's complaint. The physician shall make a report of the inmate's examination and any treatment ordered.

4. Until the provisions of paragraphs 1–3 are complied with, a report shall be submitted to this Court every 30 days indicating the status of the efforts to comply with the provisions of paragraphs 1–3.

5. Jail inmates shall be furnished such special diets as prescribed by a physician or any other member of the Jail medical staff.

6. Any inmate requiring hospitalization due to a potentially infectious or contagious disease, mental illness, or any other ailment requiring hospitalization, shall not be housed in the Jail except upon emergency application to the Court.

7. No Jail personnel shall administer or handle medication prescribed by medical authority unless duly authorized by all applicable authorities to perform such tasks.

### FOOD AND ITS DISTRIBUTION

1. *Immediate* steps shall be taken as are necessary to obtain the services of a trained dietician, nutritionist, or food director to regularly review the food menus, preparation and service.

2. Food shall be served at the proper temperatures, fresh and in a reasonable variety and quantity.

3. *Immediate* steps shall be taken to insure that food shall continue to be served with the use of heated, covered food service carts and in the events said food service carts become inoperable, a report shall be submitted to this Court indicating the reasons for such inoperability.

4. Within 120 days after acquiring the services of the trained dietician, nutritionist, or food director, as required herein, a report shall be submitted by said dietician, nutritionist, or food director, containing an opinion as to the adequacy or inadequacy of the patterns with respect to staffing and supervision of personnel required in the operation of the Jail kitchen.

5. No individuals shall work in the food handling functions of the Jail without having first been medically screened (i. e., by issuance of a health record card) and without the direct supervision of similarly screened Jail personnel.

6. The Jail kitchen and food service shall be inspected monthly by the Escambia County Health Department or other agency approved by the Court, utilizing the same minimum requirements as required for restaurants serving the public, and the reasonable recommendations and requirements made by the Escambia County Health Department or such other agency shall be immediately implemented. Copies of all such reports shall be submitted to this Court within five days after the inspections as required herein.

7. *Immediate* steps shall be taken to institute a. routine cleaning schedule for the food service areas on a daily basis and providing for adequate supervision and responsibility to designated persons. Within 30 days from the date the assistance of the Escambia County Health Department or such other agency is obtained as required herein, a report shall be submitted to this Court indicating the opinion of such department or agency as to the adequacy or inadequacy of the routine cleaning schedule for the food service areas as required herein.

8. *Immediate* steps shall be taken to acquire the services of a qualified person in the field of institutional restaurant equipment and a report of said person shall within 90 days from the date hereof be submitted to this Court reflecting said person's opinion as to the adequacy or inadequacy of the food service area and equipment present in the Escambia County Jail. Said report shall include an opinion of the afore-

said person as to the requirements to adequately equip and lay out said food service area. Such report and opinion shall be complied with by the defendants unless and except to the extent that such compliance is excused by the Court.

9. Within 90 days from the date hereof, a plan shall be submitted to this Court outlining the feasibility of providing inmate meals in areas of the Jail other than the cellblocks where meals are presently served.

## RECREATIONAL, EDUCATIONAL AND TRAINING FACILITIES

1. *Immediate* steps shall be taken as are necessary to establish the following:

(a) Group and individual counseling programs.

(b) Basic and remedial education programs including remedial reading programs.

(c) Expansion of existing religious programs.

(d) A recreation program including daily exercise programs. Inmates shall be afforded the opportunity for one hour of daily outdoor exercise within 30 days from the date hereof. Exceptions for weather or security shall be reported to the Court within 15 days specifying the reason for the exception.

2. Quarterly reports, beginning January 1, 1977, shall be submitted to this Court describing all volunteer programs and other programmatic activities available to the inmates in the Escambia County Jail, which report shall set forth an estimate of the effectiveness of each particular program.

3. Prompt arrangements shall be made for library services to inmates. There shall be no censorship of books or periodicals supplied to, purchased by, or given to inmates, except that Jail personnel may forbid the introduction into the Escambia County Jail of books or periodicals which would come clearly within the definition of obscenity established by the recent decisions of the Supreme Court of the United States. Censorship resulting in deprivations from inmates of any publication shall be rationalized in writing.

4. Inmates can subscribe to and otherwise receive books, newspapers and periodicals from any source.

## GUARD CONTROL AND SUPERVISION

1. *Immediate* steps shall be taken as are necessary to hire and train sufficient correctional officers as may be necessary to supervise properly the inmates of the Jail. There shall be at least three officers on the upstairs floor per shift.

2. Administrative officials of the Jail shall assign the remaining additional personnel so as to insure the safety of the inmates and otherwise facilitate compliance with the various programs of this permanent injunction.

3. All such additional personnel shall be adequately and properly trained. Within 60 days from the date hereof, a report shall be submitted to the Court setting forth what steps have been taken with respect to implementing this requirement, which report shall include a description of the contents of said training program.

4. Commencing 30 days from the date hereof and continuing monthly thereafter, a report shall be submitted to this Court setting forth what steps have been taken and are at the time of said reports being taken to comply with the requirements of this section. Said reports shall include a listing of all employee positions authorized and whether said positions are filled.

## VISITATION AND COMMUNICATION

1. *Immediate* steps shall be taken as are necessary to establish visiting programs, which shall include daily visiting hours and shall include evening visitation some evenings of each week, and to remove the limitations on visits with pre-trial detainees by children and by persons not being members of the inmate's family. Within 180 days from the date hereof, steps shall be taken as are necessary to provide a system of daily contact visiting for pre-trial detainees. Beginning 90 days from the date here-

of, a quarterly report shall be submitted to this Court setting forth what steps have been taken to comply with these requirements or showing cause why a system of contact visiting cannot be implemented within the time frame required.

2. *Immediate* provision shall be made for pre-trial detainees' local telephone calls daily during stated hours, both in the daytime and the evening. Inmate telephone calls shall not be monitored by Jail personnel, except as provided for by the laws and administrative regulations of the State of Florida and the United States.

3. The facility presently available at the Escambia County Jail for the delivery of clothing, health and comfort items and money for inmates shall be open daily, both in the daytime and in the evening (before 8 o'clock). Said facility shall always be open during established visiting hours.

4. There shall be no opening or other interference with any incoming or outgoing mail of inmates, except to open and inspect in the presence of the inmate any letter where Jail officials have reasonable grounds to suspect such communication is an attempt to formulate, devise or otherwise effectuate a plan to escape from the Jail, or to violate the laws or administrative regulations of the State of Florida or of the United States. Jail officials may also inspect an inmate's mail for contraband only in the inmate's presence but in such case shall not read the mail. Inmate mail shall be delivered to inmates on each day that the postal service normally delivers mail.

## IMPAIRMENT OF DEFENSE AT TRIAL

1. Attorneys representing inmates in the Escambia County Jail shall have access to said inmates at anytime within 12 hours of arrest. Normal visiting hours for attorneys shall otherwise be between 6 A. M. and 10 P. M. daily.

2. *Immediate* steps shall be taken to furnish adequate facilities for attorney-client conferences, which facilities shall insure the confidentiality of attorney-client communications. Attorneys shall be given priority for use of these facilities.

3. A law library shall be available for daily inmate use and shall include within 60 days from the date hereof:

United States Supreme Court Reports, Lawyers' Edition, Second Series;

Southern Reporter, Second Series (Florida Cases) commencing volume 121;

Florida Statutes Annotated, Volumes 22–24, 33 and 34;

United States Code Annotated, Titles 18, 28, and 42, §§ 1891–1988;

Florida Rules of Criminal Procedure (25 copies);

Federal Rules of Criminal Procedure;

Federal Rules of Civil Procedure;

Black's Law Dictionary.

## SUMS TO DISCHARGED INMATES

There shall be immediate compliance with Section 951.04, Florida Statutes, which provides sums to discharged inmates. It is further

## ORDERED AND ADJUDGED

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure; and, it is further

## ORDERED AND ADJUDGED

This Court retains jurisdiction for the purpose of further implementation of this permanent injunction and such other orders as are appropriate. Costs are taxed against the defendants.