Kenneth OWENS–EL and Inmates and Future Residents of Allegheny County Jail, Plaintiffs,

v.

William ROBINSON and James Jennings, Defendants.

INMATES OF the ALLEGHENY COUNTY JAIL, Thomas Price Bey, Arthur Goslee, Robert Maloney, and Calvin Milligan on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Robert PEIRCE, Chairman, Allegheny County Board of Prison Inspectors and all other members of the Board, James Jennings, Warden, Allegheny County Jail, and James Flaherty, Robert Peirce and Thomas Foerster, Commissioners for Allegheny County, Defendants.

Civ. A. Nos. 75–412 and 76–743.

United States District Court,
W. D. Pennsylvania.

Jan. 4, 1978.

Jere Krakoff, Neighborhood Legal Services, Pittsburgh, Pa., for plaintiffs in No. 76–743.

John G. Arch, Pittsburgh, Pa., for defendants.

## OPINION

COHILL, District Judge.

### I

### Jurisdiction and Background

Plaintiff, Kenneth Owens-El, is a former inmate of the Allegheny County Jail ("jail"), Pittsburgh, Pennsylvania. In 1975 he filed a *pro se* suit (one filed by himself without legal counsel), challenging the constitutionality of the conditions under which inmates of the jail are confined and seeking money damages and equitable relief. The complaint named as a defendant, William Robinson, the warden of the jail when the complaint was filed. James Jennings was added as a defendant when he succeeded Warden Robinson. The case was referred to the United States magistrate for a report and recommendation.

In 1976 Neighborhood Legal Services ("NLS") filed a class action suit in behalf of all jail inmates, past, present and future, petitioning for a declaratory judgment holding that the conditions of confinement at the jail violate the constitutional rights of the inmates. The complaint named as defendants the Allegheny County Commissioners, the members of the Allegheny County Board of Prison Inspectors, and James Jennings, the warden of the jail.

With the consent of all parties, these two cases were consolidated for trial and certified as a class action. Calvin Milligan, a member of the class, and plaintiff, Kenneth Owens-El, acted as their own legal counsel in cooperation with the NLS attorneys.

Specifically, the plaintiffs brought suit under 42 U.S.C. § 1983 (the Civil Rights Act of 1871) contending that the conditions within the jail constitute cruel and unusual punishment proscribed by the Eighth Amendment of the United States Constitution, violate their rights to due process and equal protection under the Fourteenth Amendment, and violate their rights under the First, Fourth and Sixth Amendments of the Constitution.

This court has jurisdiction under 28 U.S.C. § 1343, granting jurisdiction in civil rights cases to the United States district courts, 28 U.S.C. § 2201, providing for declaratory judgments and 28 U.S.C. § 2202, allowing further relief based on a declaratory judgment.

After extensive pretrial discovery by the parties, a six week non-jury trial ensued

during which the testimony of some 50 witnesses was heard, including that of experts in the fields of mental health, medicine, penology and hygiene. Other witnesses included guards, nurses, prisoners, former prisoners, attorneys, a county commissioner, the Sheriff of Allegheny County, a representative of the Coroner's office, an exterminator, the present warden of the jail and the former jail warden, who is now Commissioner of Corrections for Pennsylvania.

## II.

### Methodology

We do not subscribe to the theory that a jail should be a country club, rest home or resort; nevertheless, prisoners are entitled to certain rights and the basic elements of human dignity. See *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). During the trial it became apparent that the relatively long-term prisoners in the two state penal institutions closest to Pittsburgh, the State Regional Correctional Facility at Greensburg and the State Correctional Institution at Pittsburgh (more commonly known as "Western Penitentiary") receive better care and treatment than the jail inmates, yet most of the persons confined in the jail are pretrial detainees; that is, they have not been convicted of anything; they are there simply because they can't obtain a bail bond to secure their release prior to their trials.

Besides pretrial detainees, there are also other classifications of inmates housed in the jail. These include inmates who have been convicted but are awaiting sentencing, inmates who have been committed to the jail for misdemeanors for relatively short sentences, those who are in, out and in again as part of a work-release program, federal prisoners awaiting trial or sentencing, and state and federal prisoners who have been brought from other institutions to reside in the jail while testifying in other cases in either the state or federal courts. Thus it is a "mixed bag" of residents and obviously a difficult situation for county officials to deal with. It is not and would not be practical to have separate facilities for each such class of inmate. We are nevertheless convinced that the inmates' constitutional rights have been violated and that remedial action is required.

We heard the opinions of expert witnesses as to what the optimum standards for confined persons should be as well as their criticisms of the existing accommodations and procedures at the jail. Nevertheless, a federal court may only invalidate those practices which constitute violations of federally guaranteed rights. The function of this court is not to determine what practices the court would implement if it were the jail administrator, but rather to establish minimal standards in those areas where the basic rights of inmates have been violated.

We have attempted here to strike a balance between the legitimate demands of pretrial detainees for unfettered enjoyment of those rights to which they are entitled as persons unconvicted of any crime and the compelling custodial necessities of a jail administration.

We are reluctant to interfere with such administration, and we do so now in certain areas only because paramount rights of the plaintiff inmates have supervened.

In recent years the County has tried to enhance and make more tolerable the conditions of the jail, mainly through capital improvements. Almost four million dollars have been spent in these improvements. Despite this, more changes are necessary to meet minimum constitutional standards in some areas.

It is well established that an individual or a class may not be deprived of constitutional rights simply because of economic considerations. See *Rozecki v. Gaughan,* 459 F.2d 6 (1st Cir. 1972); *Jackson v. Bishop,* 404 F.2d 571 (8th Cir. 1968); and *Brenneman v. Madigan,* 343 F.Supp. 128 (N.D. Cal.1972). "Lack of funds is not an acceptable excuse for unconstitutional conditions of incarceration." *Finney v. Arkansas Board of Correction,* 505 F.2d 194, 201 (8th Cir. 1974).

■ Where pretrial detainees and convicted persons are comingled in their cell assignments, the constitutional common denominator must be the rights of the pretrial detainees. Accordingly, a showing of a total picture of confinement, which constitutes a deprivation of due process for the pretrial detainees, and which cannot be remedied except by changes which will affect the convicted and detainees alike, will necessitate relief for both groups. *Bay County Jail Inmates v. Bay County Board of Commissioners*, Civil No. 74–10056 (E.D. Mich., 8/29/74), cited in *O'Bryan v. County of Saginaw, Mich.* 437 F.Supp. 582 (E.D. Mich.1977).

On the first day of the trial of this case, after hearing the opening statements of counsel and the participating inmates, but before taking any testimony, we announced, without advance notice to anyone, that we wished to tour the jail. Within half an hour we had commenced a thorough inspection, including having lunch in the guards' dining room and eating the same food as that served to the prisoners. The inspection and tour lasted approximately three hours.

We believe that a case like this should be decided on the basis of the facts as they existed when suit was filed, not when the court's inspection occurred; otherwise, continually changing conditions would make it virtually impossible ever to terminate the case. The tour was helpful, however, in enabling the court to understand what areas of the jail witnesses were talking about as their testimony developed, and the conditions that they were describing.

As required by Fed.R.Civ.P. 52, we have made Findings of Fact specially and have stated separately our Conclusions of Law based thereon. We have departed from the usual method of organizing such an Opinion, however; the common practice is for the court to state all the Findings of Fact pertaining to the case and then to set forth the court's Conclusions of Law. Because of the many subject areas considered during the trial of this case, that method would be cumbersome and perhaps confusing. In-

stead, we will first consider the law as it generally pertains to "inmates' cases" and then discuss each subject area of this case separately, making the Findings of Fact, stating our Conclusions of Law pertaining thereto, and then moving on to the next area where the process will be repeated.

### III

*The Law Pertaining to "Inmates' Cases"*

■ At one time, it was the policy of the federal courts to avoid interference with the administration of state penal facilities. This "hands-off" attitude has been reevaluated by the courts in the last decade in response to mushrooming litigation filed by prisoners challenging the constitutionality of conditions under which they are confined and has now evolved to the point that the federal courts will intervene where the situation warrants.

The Supreme Court, in *Procunier v. Martinez*, 416 U.S. 396, 405–406, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224, 236 (1974) stated:

"[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."

■ The extent to which constitutional guarantees can be limited by incarceration is determined by the legal status of the inmate. *Brenneman v. Madigan*, 343 F.Supp. 128 (N.D.Cal.1972); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1973), *aff'd* 494 F.2d 1196 (1st Cir. 1974). In the instant case a majority of the plaintiffs are pretrial detainees, incarcerated only because they are unable to post the necessary bail bond which would entitle them to release. The only legitimate state interest in the detention of an accused who cannot raise bail is in guaranteeing his presence at trial. *U. S. ex rel. Tyrrell v. Speaker*, 535 F.2d 823 (3d Cir. 1976).

Putting the purpose of pretrial detention into constitutional perspective, the court in *Rhem v. Malcolm*, 507 F.2d 333 (2d Cir. 1974) (cited with approval by the Third Circuit in *Tyrrell, supra*) stated at 336:

"The demands of equal protection of the law and of due process prohibit depriving pre-trial detainees of rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail; and the same constitutional provisions prevent unjustifiable confinement of detainees under worse conditions than convicted prisoners . . . a detainee is entitled to protection from cruel and unusual punishment as a matter of due process, and where relevant, equal protection."

In its entirety the Eighth Amendment reads: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" (Emphasis supplied.) We are here, of course, concerned only with the clause prohibiting cruel and unusual punishments.

During congressional consideration of this Amendment in 1789, one member said:

"No cruel and unusual punishment is to be inflicted; it is sometimes necessary to hang a man, villains often deserve whipping, and perhaps having their ears cut off; but are we in the future to be prevented from inflicting these punishments because they are cruel? If a more lenient mode of correcting vice and deterring others from the commission of it would be invented, it would be very prudent in the Legislature to adopt it; but until we have some security that this will be done, we ought not to be restrained from making necessary laws by any declaration of this kind."

1 Annals of Congress 754 (1789)

In *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910) the court concluded that the framers of the Amendment did not merely intend to prohibit punishments, procedures and techniques felt to be cruel and unusual in 1789, but that they intended to prevent coercive cruelty being exercised through other forms of punishment. *Trop v. Dulles*, 356 U.S. 86, 100–101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) held that the amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

■ Thus, what might have been common and not thought to be at all cruel or unusual in 1789 might be completely obnoxious to society in the United States today.

The part of Section 1 of the Fourteenth Amendment pertinent to this case states:

". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The attitude of the federal courts in such cases has evolved in the last few years from one of "hands-off" to one of scrutiny and, at times, active involvement where the situation required it.

After listening closely to the many witnesses, carefully studying the briefs filed and hearing post trial arguments, we are convinced that the situation at the Allegheny County Jail requires the intervention of this court.

IV

*Physical Plant and Physical Care Findings of Fact*

The Allegheny County Jail is an eighty-three year old structure in the heart of downtown Pittsburgh. It is primarily a pretrial detention facility, housing unconvicted persons awaiting trial. The jail also serves as a detention unit for convicted state and federal prisoners awaiting sentencing, assignment or transfer to other institutions and for the confinement of miscellaneous county prisoners convicted of misdemeanors and serving short sentences. It also houses prisoners brought from other institutions to testify in federal or state trials.

The average length of stay for an inmate is 22 days. However, some residents may be in the jail for a few hours, while others may be there more than a year.

The majority of male inmates are housed in the so-called Large Block (240 cells), Small Block (200 cells), and the Juvenile Block. Each block consists of ten ranges or rows of cells and is five tiers high. The remainder of the inmates are housed in the recently remodeled Selective Housing Unit ("SHU") and the Summary Block. There is also a female unit which was not the subject of either of the petitions considered here.

An average cell is approximately seven feet wide and eight feet long. It contains a sink with push button cold water, a seatless toilet, and a piece of canvas stretched over a frame for sleeping. The frame is suspended from the wall of the cell by a chain at one end and located in such a way that part of it is directly over the toilet. The other end fits into the cell door when it is in use. The cell is lighted by a 25 or 40 watt bulb located either inside or just outside the cell. If the light is outside the cell the prisoner cannot control it; this results in many being broken by prisoners frustrated by being unable to turn it off. None of the cells have hot water.

Many of the canvas cots are discolored by blood, vomit, feces and urine; some are torn. A number of sinks and toilets do not work; nearly all are stained to a dark brown color and filth-encrusted. Leaks and overflows often occur. The officers' written daily reports (admitted as exhibits) recite the presence of filth and dirt in the cells and common areas with monotonous regularity.

An environmental health expert, Mr. Theodore Gordon, testified that there was a build up of filth in many areas. Crusts of bread and other food lie decaying in hard-to-reach places on windowsills. There are mice, rats and roaches attracted by the filth and food remnants.

On March 23, 1977, more than seventy of the 240 cells in the Large Block had electrical problems, according to the reports.

Some of the lights are ingeniously, but dangerously wired into the cells by prisoners who have acted as their own electricians. The exposed wires are a fire hazard and expose inmates to the possibility of electrical shock. Adequate lighting in the cells does not exist. This contributes to prisoner stress and makes much more difficult the maintenance of security and sanitation within the institution. Inmates cause most of the broken lights and damage to fixtures. Months often go by before a county electrician can come to the jail to make repairs.

There are about 600 cells in the jail; as many as 200 cells at a time are unuseable ("down") for one reason or another. Overcrowding of the institution is not a problem. In 1975 the average daily population was 429. On an average day five or six inmates are housed in cells without water or lighting. The administration attempts to transfer inmates out of the down cells to cells with adequate plumbing as they become available, but the prisoners actually make their own cell choices and arrangements. The best cells go to the toughest inmates.

Each inmate is responsible for cleaning his own cell. Disciplinary action is supposed to be taken against inmates who refuse to clean their cells. It never is. Cleaning materials such as cleanser, mops, and brushes are supposed to be available for inmates' use on each range, but rarely are adequate.

Over $30,000 a year are spent on janitorial supplies for the jail. Often these supplies are not available to the inmates. Why they are not never became clear during the trial. Jail personnel testified that such supplies were available; inmates said they normally were not. There was some speculation but no proof of what happened to the supplies. We are convinced, and find as a matter of fact, that sufficient cleaning supplies and implements did not find their way to the prisoners, for whatever reason.

The common areas and halls and any unoccupied cells are supposed to be cleaned by "rangers," inmates who volunteer for

the position. They are swept, but the walls, floors and steel bars are dirty with a kind of greasy dirt, such as one might find in a dirty kitchen. The service areas ("waterways") behind the cells contain debris and accumulations of standing water from leaking pipes. Cockroaches infest the waterways and cells at night. There are also mice throughout the building and rats in the outside area where the garbage cans are stored.

There is no systematic procedure for cleaning the jail. The last time the canvas cots were taken outside for cleaning and "airing" was three or four years ago. In the opinion of one penal expert, Mr. George Camp, the conditions he observed when visiting the jail in April, 1976, and on which he based his opinion as to the deficiencies in cleaning procedures, had persisted for a substantial period of time prior to his visit and would continue unless changes occurred. We adopt that opinion as a fact.

The physical deterioration of the jail can at least be retarded, if not reversed, by systematic good housekeeping practices. Soap, brushes, elbow grease and supervision are the necessary ingredients for cleanliness in the jail.

The plaintiffs' environmental expert, Mr. Gordon, testified, in answer to a question from the court, that a steam cleaning apparatus could be used effectively to clean the metal bars and some of the other areas of the jail which are coated with the greasy dirt.

The defendants offered testimony that the problems regarding sanitation, plumbing, and electrical wiring were directly attributable to the inmates themselves as they were responsible for cleaning their cells and had willfully vandalized the toilets, sinks, electrical switches and light bulbs.

The jail administration has a program for systematically replacing toilets. A county plumber is permanently assigned to the jail. The jail administration often requests the services of a county electrician, but he only comes to the jail when he has time. His visits may be months apart. Both the plumber and electrician must be accompanied on their rounds by a guard, who is usually taken off another assignment in order to do so. Cots are repaired and replaced at the jail, but there is no procedure for cleaning the canvas. The jail uses the services of a private exterminating company once a week for rodent and bug control and provides bug spray to inmates.

The temperature inside the jail fluctuates in the extreme. Whatever may be the inconvenience outside the jail for Allegheny County residents in summer heat and winter cold, the temperature extremes are worse in the jail and are of a longer duration. The top windows in the block areas are broken by inmates during the summer heat and remain unrepaired into the winter. Many witnesses testified that the jail temperatures were unbearable for inmates and guards alike. In order to keep cold air out of their cells in winter, inmates weave newspapers through their cell bars, and some inmates wear overcoats and hats. The woven newspapers present a serious fire hazard.

There is no written evacuation plan to be followed in case of fire.

There is considerable difference between jail policy and practice. According to jail policy a new inmate reports to a circle desk located in the rotunda in the open area of the jail in the middle of the cell blocks. He is supposed to be given a jail rule book, issued one blanket and one sheet and assigned to a cell. For several years sheets were not issued for security reasons, but shortly before the trial the administration had started to issue them again.

No clothing or toilet articles are issued to inmates, although prisoners assigned to certain work details, such as the bakery, get uniforms. Toilet articles may be purchased in the jail commissary. Towels are provided in the bathhouse (the common shower area) but may not be taken from the bathhouse to the cells.

Prisoners get free laundry service.

The uncontradicted testimony of inmates, former inmates and guards alike revealed

that the jail practice is quite different from its stated policy in these areas.

When a new inmate reports to the desk he is told what cell to go to, but often as not he may find someone else occupying it or that the sink, toilet or light doesn't work, that the cot is torn and unusable or that there is some other serious defect. In such cases he looks around, hoping to find a better one unoccupied and simply takes it.

As stated, the jail only recently began to issue sheets again, and there are chronic blanket and sheet shortages. Although the jail owns 700 blankets, often it is days before an inmate is issued a blanket or manages to steal or barter for one from another inmate.

Although toilet articles are available for sale in the jail commissary, an indigent prisoner is out of luck. The warden testified that if an indigent inmate asked him for toilet articles, he would see that he got them, but this was done strictly on an informal basis, and unfortunately is typical of the uneven management in many of the situations which occur at the jail.

The present warden, James Jennings, impressed us as a humane, caring individual, but all too often situations such as an inmate without toilet articles, were handled on an *ad hoc* basis. There was no established policy or route that all indigent prisoners would know to follow. A timid, fearful or new inmate would hardly be likely to approach the warden and ask him for a toothbrush. On the other hand, an "old timer" could survive pretty well.

During our visit to the jail on several occasions inmates approached the warden and said they wanted to talk to him about something. He invariably responded positively and made the arrangements. This revealed a good relationship between him and the inmate population, but also indicated a lack of channels to handle complaints or personal problems of inmates.

During shakedowns (searches of cells by guards) sometimes one prisoner would be found to have as many as twenty blankets. He would dole them out to friends or "sell"

them to new inmates able to purchase them. Cigarettes are the most common form of currency among inmates.

Shakedowns invariably uncover large numbers of blankets and sheets in inmates' cells.

The bath towel situation is bad. Although the policy is that prisoners are issued towels in the bathhouse when they shower, they may not take them to their cells, in fact there are chronic shortages of towels, in which case the inmate must dry out "au naturel" or use his clothes as a towel and dry off with them. He is never given a towel to use in his cell.

Although jail policy calls for free personal laundry service for prisoners, the inmate laundry workers will not do the laundry unless "paid" by the prisoner desiring it. So much laundry is stolen that prisoners rarely avail themselves of the laundry and either wash clothes in the sink or toilet in their cells or rely on friends or relatives outside the jail to perform this service.

The hoarding, vandalism, and shortages would be greatly reduced through closer supervision and hiring more guards.

### Conclusions of Law

■ There is absolutely no relationship between the unhealthy and unsanitary conditions of this jail and the security necessary to guarantee an inmate's presence at trial or the internal security of the jail. The total effect of these conditions is to deprive the plaintiffs of their constitutional rights.

■ Subjecting pretrial detainees to restrictions and privation other than those which are inherent in confinement itself, or which are justified by compelling necessities of jail administration, is a violation of the due process and equal protection clauses of the Fourteenth Amendment. A tolerable living environment for inmates is now guaranteed by law. *See Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.1974), *aff'd* 507 F.2d 333 (2d Cir. 1974). We do not have to decide whether conditions at the jail are so bad as to be cruel and unusual punishment

for convicted felons. It is enough if the conditions for pretrial detainees are so unnecessary as to be a denial of due process. *Rhem v. Malcolm*, 507 F.2d 333 (2d Cir. 1974).

The Constitution does not require that prisoners be provided with any and every amenity, but inmates must be furnished with the basic necessities of life which include reasonably adequate food, clothing, shelter, sanitation, medical care and personal safety. *Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977). A pretrial detainee is entitled to protection from cruel and unusual punishment as a matter of due process. *Rhem v. Malcolm, supra.* The quality of incarceration at the jail amounts to punishment of such a nature and degree that it cannot be justified by the county's interest in holding accused persons for trial, and therefore it violates the due process clause of the Fourteenth Amendment.

The failure to provide adequate beds or other sleeping facilities, the failure to provide adequate clothing, and the failure to provide facilities and equipment for personal hygiene constitute cruel and unusual punishment for convicted inmates and violate the rights to due process and equal protection of unconvicted detainees. *Martinez Rodriguez v. Jimenez*, 409 F.Supp. 582 (D.P.R.), *petition for stay denied*, 537 F.2d 1 (1st Cir. 1976); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass. 1973), *aff'd* 494 F.2d 1196 (1st Cir. 1974); *Mitchell v. Untreiner*, 421 F.Supp. 886 (N.D. Fla.1976). In one case, to eliminate a persisting problem of inmate hoarding of blankets, sheets, cleaning supplies, etc., a Louisiana federal court simply ordered an increase in the number of shakedowns, also decreeing that they were not to be conducted in a harassing manner. *Hamilton v. Landrieu*, 351 F.Supp. 549 (E.D.La.1972).

Pretrial detainees are entitled constitutionally to clean and sanitary living quarters. *Mitchell v. Untreiner, supra; Jones v. Wittenberg*, 330 F.Supp. 707 (N.D. Ohio 1971), *aff'd* 456 F.2d 854 (6th Cir. 1972). Some courts have found it necessary to order the implementation of sanitation and cleaning procedures whereby inmates must clean the tiers and all other areas of the prison. *Hamilton v. Landrieu*, 351 F.Supp. 549 (E.D.La.1972). Inmates can be encouraged to clean by making available privileges to inmates who cooperate and denying privileges to inmates who refuse to cooperate. *Hamilton v. Landrieu, supra.*

## V

### *Medical Treatment—Use of Restraints*
### *Findings of Fact*

When an individual first enters the jail, a blood sample is taken and tested to determine if the inmate has a venereal disease; a chest x-ray is taken and examined for tuberculosis, and a nurse asks the prisoner if he has any medical problems, such as diabetes, epilepsy, or drug addiction. The report of any medical condition is noted, and the individual either sees a doctor or is given medication under standing orders which the doctor has given for certain kinds of problems. Only prisoners who have been sentenced and assigned to the jail pending transportation to some other institution, and those working in the kitchen or bakery, are given complete physical examinations.

An inmate wanting to see the doctor makes such a request to the nurse at "Health Call" (sick call). The nurse then either gives the inmate standard medication, or puts the inmate on a list to be seen later by the doctor. The nurses keep log books regarding patients and medications administered, and these log books are reviewed by the doctor. The doctor also makes rounds in the jail hospital. The jail physician spends from two to two and one-half hours a day in the jail, six days a week, and is on call twenty-four hours a day seven days a week.

Kenneth Owens-El introduced testimony intended to prove that the death of an inmate, Dennis Phillips, on February 14, 1975, was caused by failure of the guards to respond to calls for help and by the negligence of the jail medical personnel. We find that the burden of proof was not met.

Calvin Milligan testified that he personally had received inadequate medical attention at the jail in connection with a respiratory condition. We find that this burden of proof was not met.

The jail hospital is made up of two rooms. One of the rooms is called the "restraint room." The restraint room is, as the name implies, for inmates who are having problems of a sort which, in the opinion of the person committing them to the room, are causing them to be a threat to themselves or others. These problems range from simple "acting-out" behavior to drug withdrawal, delirium tremens, epileptic seizures and mental instability.

In this bleak room the inmates are placed in a hospital gown or naked on a canvas cot with a hole cut in the middle. Their body wastes drop through the hole into a tub on the floor underneath the cot. The tub is emptied twice a day. These inmates are shackled by leather restraints to the canvas cots. Physical restraints may be either full, where the inmate's wrists and ankles are bound by the manacles to the cot, or partial, where only one or both ankles are manacled. The medical logs, introduced into evidence, revealed that inmates have been held in such restraints for as long as twenty-nine days. For seven months in 1976, there was an average of nearly five men in restraints per day.

While we heard testimony that similar restraints are used in hospitals and nursing homes, the present jail physician testified that he had never seen the hole-in-the-cot arrangement anywhere except in this jail. One expert witness, George Camp, characterized the restraint room as "horrendous and barbaric."

Dr. Frank Rundle, a psychiatrist, testified that the general opinion of the psychiatric community in the United States is that the use of restraints is undesirable; that their use should be avoided if possible, with the ultimate goal being their total elimination and replacement by other methods. If restraints are used, such use should be severely limited and under close medical supervision.

The jail administration (guard corporals and up), the nurses and doctor have the authority to order inmates into restraints. The doctor is in charge of releasing people from restraints. When an individual is placed in restraints, the person ordering it must notify the warden and the medical staff. Jail policy mandates the use of restraints only when necessary to prevent an inmate from harming himself or others—i. e. for medical or protective reasons only.

After examining the hospital log (admitted into evidence), which documents every instance in which an inmate is put into restraints, we find that the restraint room is being used excessively, inappropriately and as a punishment in some instances. It is being used for disciplinary and security purposes and inappropriately when viewed as a treatment device. It is the method used to deal with inmates exhibiting antisocial behavior and those with possible severe mental disorders. Inmates with epilepsy are often put into restraints following seizures. This is life-threatening. It is an undisputed medical fact that there is a high fatality rate among person suffering from delirium tremens. They, too, are put into restraints at the jail.

When a member of the prison staff feels an inmate is demonstrating suicidal tendencies, the inmate is put into restraints. A more appropriate way to protect a potential suicide case is to place him where he can be observed twenty-four hours a day without being physically restrained.

Under present jail policy inmates can be placed in restraints without a doctor's prior authorization and on the orders of a nurse or an officer of the guard. The jail physician has standing orders authorizing the use of restraints when an inmate is hyperactive, combative, hysterical, or threatening harm to himself. A doctor sees a recently restrained inmate on the next regularly scheduled hospital round. There is no written procedure for a doctor to evaluate a restrained inmate to see if continued use of restraints is necessary or needed to monitor his condition. The jail physician testified that on each restraint room round, he reen-

ters the restraint order or terminates it. It takes the doctor approximately 35 seconds to decide if the inmate should remain in restraints for another 24 hours.

Only one guard is on duty in the hospital, and his territory includes the restraint room. Nurses visit the restraint room twice every shift. One of the guards assigned to the restraint room testified that he brought his own disinfectant for months when it was not supplied by the administration.

When the existence of the restraint room came to light during the trial of this case, the contract between the federal government and the County for housing federal prisoners at the jail was revised to prohibit placing federal prisoners in the restraint room.

There are no psychiatrists or psychologists on the jail staff. The present jail physician from time to time consults with the psychiatrists at the Allegheny County Behavior Clinic which is under the jurisdiction of the Allegheny County Court of Common Pleas. A Behavior Clinic psychiatrist comes to the jail when requested to see patients and to make suggestions regarding medication. If the psychiatrist recommends commitment of an inmate to a psychiatric facility, it usually takes from three to six weeks before the patient is admitted to the facility.

### Conclusions of Law

It was difficult to hear the testimony and review the logs pertaining to the use of restraint room without expressing indignation and sadness. The present mode of using the restraint room is constitutionally impermissible. It constitutes cruel and unusual punishment in violation of the inmates' rights to due process under the law. It deprives the pretrial inmates of rights of other citizens to a greater extent than is necessary to assure their appearance at trial or to insure the security of the jail.

The concept of cruel and unusual punishment is a notion which "tends to broaden as society tends to pay more regard to human decency and dignity and becomes, or likes to think that it becomes, more humane." *Holt v. Sarver*, 309 F.Supp. 362, 380 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1971). A finding of cruel and unusual punishment is not limited to those situations where a particular person has been singled out for punishment, but extends to the conditions of confinement within an institution if they collectively fall to a shocking level. *Holt v. Sarver, supra.*

Within the present jail setting, forms of treatment other than restraints could be implemented, such as the use of medically approved drugs for inmates suffering from epilepsy or those who are mentally ill; inmates exhibiting behavior problems can and should be segregated from the general population, but not in the manner now utilized. Prisoners suffering delirium tremens must be treated in a medical facility.

Other courts have established procedures governing the use of physical restraints in a jail setting. *Campbell v. McGruder*, 416 F.Supp. 100 (D.D.C.1975); *Inmates, D.C. Jail v. Jackson*, 416 F.Supp. 119 (D.D.C. 1976).

Our Order will do likewise.

In reaching the foregoing conclusions we were aided by the testimony of informed experts of national reputation having no direct interest in the outcome of this case. The testimony of those witnesses aided us in our attempt to determine this nation's contemporary concepts of the basic dignity of man and the standards of decency applicable to the flexible standard of cruel and unusual punishment, the principal of civilized treatment guaranteed by the Eighth and Fourteenth Amendments.

We cannot, in good conscience, write this Opinion without commenting on the lack of mental health treatment facilities in this community for persons such as the inmates of the jail. There is no suitable arrangement within the jail for dealing with violent, acting-out mentally unstable inmates. Neither are we aware of any mental health facility in the community with the capacity to deal with such unfortunate people.

It became obvious during the trial that there is difficulty, indeed, perhaps tension, between jail personnel and "outside" mental health personnel in handling such persons. While ordering the creation of such a facility in the community would be going beyond the parameters of the case before us, we are compelled to comment that the absence of such facilities is noteworthy, and we strongly suggest that the appropriate authorities at the federal, state and local levels seek to provide such a facility before a tragedy occurs.

## VI

### Drug Detoxification

#### Findings of Fact

If a new inmate has been receiving methadone from one of the four methadone clinics located in Allegheny County as a treatment for drug addiction prior to his confinement, the inmate is allowed to receive methadone delivered to the jail from the methadone clinic for a period of six days after his admission to the jail. If he has not been a patient at an Allegheny County methadone clinic he will not receive any methadone, even if he might have been receiving it at a clinic outside of Allegheny County.

The symptoms of methadone or heroin withdrawal may include severe abdominal pain and cramps, bone pain, muscle aches, diarrhea, vomiting, runny eyes and nose and various levels of anxiety. After receiving methadone for six days in the jail, this treatment is terminated, but the inmate can request other medication to help ease his methadone or heroin withdrawal. Those dispensed at the jail include the tranquilizer Sparine and the medicines, Tylenol, Maalox and Benadryl.

There was conflicting medical testimony relative to the merits of methadone and other methods of detoxifying drug users. One expert testified that seven days of methadone treatment would be sufficient. Another advocated the administration of decreasing methadone dosages over a 21 day period.

Both the prior and present jail physicians approve of the jail's programs for treating methadone and heroin withdrawal. They testified that it was within the realm of sound medical practice.

In view of the lack of unanimity of medical opinion, we make no finding of fact with respect to the merits of the jail drug detoxification program.

### Conclusions of Law

■ Prison officials are invested with broad discretion with respect to the provision of medical care for prisoners. *Henderson v. Thrower,* 497 F.2d 125 (5th Cir. 1974). Federal courts will not inquire into adequacy or sufficiency of medical care of state prisoners unless there appears to have been an abuse of the broad discretion which prison officials possess in this area. *Haskew v. Wainwright,* 429 F.2d 525 (5th Cir. 1970).

■ This court will not attempt to decide what might be the best medical practice in treating drug withdrawal. The question of what form of treatment is indicated for this condition is a matter for discrete medical judgment. The current treatment program at the jail is considered by some members of the medical profession to be appropriate, and we find no abuse of the discretion of the jail physicians regarding this treatment.

We would comment, however, that the six day methadone program at the jail may be overly rigid. At present the only prisoners who get methadone treatment are those who are being treated in clinics located in Allegheny County prior to their incarceration, and the six day limit applies regardless of the amount of methadone or heroin the inmate was using prior to his confinement.

■ Since any inmate from outside Allegheny County (and there are many) is not given any methadone treatment at the jail, this uneven treatment violates the equal protection clause of the Fourteenth Amendment.

The problem could be obviated by the jail qualifying as a detoxification clinic under

the mandates of 21 C.F.R. § 310.505.[1] If the jail were so designated, then drug detoxification treatment could be prescribed on an individualized basis.

## VII

### Disciplinary Hearings

### Findings of Fact

Inmates charged with misconduct within the jail receive a hearing before the jail's Disciplinary Board. This Board formerly consisted of the deputy warden, a guard and a counsellor. The counsellor program at the jail has been discontinued since these suits were filed, and we do not know the present composition of the Board.

The person making the charges writes a report describing the occurrence asserted to be a violation of the rules and submits this report to the Board. The inmate is not given a copy of the report. The charging officer is rarely at the hearing. While the inmate is allowed to speak at the hearing, he is not allowed to call witnesses. The Disciplinary Board has the power to: (1) exonerate the individual, (2) reprimand the individual, (3) take away certain privileges, or (4) confine the individual to "double lock" for a maximum of fourteen consecutive days. Double lock is solitary confinement and is considered in Part VIII hereof.

The inmate may appeal the decision of the Board to the warden.

### Conclusions of Law

The United States Supreme Court has said:

> "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with the determination of the precise nature of the government function involved as well as the private interest that has been affected by governmental action."

*Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The jail administration has a valid interest in maintaining a safe and orderly institution. While the disciplinary hearings do not result in serious punishment such as loss of "good time" credits or solitary confinement for a substantial period of time, they can result in depriving inmates of certain privileges or in segregating them from the general population for up to fourteen days.

■ Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. In sum, there must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application. *Wolff v. McDonnell, supra.*

■ After the notice of charges is delivered a brief period of time should be allowed for the inmate to prepare for his appearance before the Disciplinary Board. The right to call witnesses, confrontation, and cross examination in such a hearing carry an obvious potential for disruption in the jail setting, and in some cases may be hazardous to institutional interests. We will not go so far as to require this. See *Baxter v. Palmigiano*, 425 U.S. 308, 47 L.Ed.2d 810, 96 S.Ct. 1551 (1976).

## VIII

### Double Lock—Solitary Confinement

### Findings of Fact

The Disciplinary Board has the authority to sentence an inmate to up to fourteen days in double lock (solitary confinement). See Part VII hereof. A double lock cell is similar to a regular cell but for the fact that the prisoner in double lock sleeps on a perforated steel sheet with no mattress. This is attached by chains to the walls of the cell.

In addition, inmates in double lock are confined to their cells twenty-four hours a day except for trips to the bathhouse twice

---

1. We take judicial notice of the fact that three county prisons in Pennsylvania are licensed methadone detoxification clinics: the Philadelphia Detention Center, the Montgomery County Prison, and the Northampton County Prison.

a week for showers. They are permitted to have a blanket. Only visits from attorneys are permitted; the inmate can request to see the jail physician.

Meals are delivered to and eaten in the double lock cells. For some unknown reason dirty dishes are only picked up once a day. This naturally attracts rodents and bugs. Inmates sentenced to double lock are not permitted toothbrushes or toothpaste, and are not permitted to change their clothing.

Withholding mattresses, sheets, and ordinary toilet articles serves no useful purpose. The principal behind the use of solitary confinement is to punish a person by restricting his movements and segregating him from the rest of the population. Fourteen days of solitary confinement would not be excessive under normal circumstances; however, the existing conditions of double lock in this jail make any time spent there excessive.

### Conclusions of Law

To promote the legitimate institutional interest of maintaining order and discipline in the jail, the administration may find it necessary to use solitary confinement as a punishment for the infraction of jail rules. Enforced isolation and boredom are permissible methods of discipline. *La Reau v. MacDougall,* 473 F.2d 974 (2d Cir. 1972), *cert. den.* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

Isolation, however, may differ from normal confinement only in the loss of freedom and privileges permitted to other prisoners. *Jones v. Wittenberg,* 330 F.Supp. 707 (N.D.Ohio 1971). We do not find that possession of a mattress and sheet, ordinary toilet articles, or a change of clothing are privileges; rather in this day and age they are necessities to which anyone in an institution is entitled.

We see no legitimate institutional interest in depriving inmates in double lock of such items. Neither is there any legitimate reason for picking up dirty dishes only once a day. We find that withholding such

items from inmates in double lock and failing to exercise ordinary sanitary practices violate their due process rights. Adequate bedding must also be provided to inmates in double lock, as well as elsewhere in the institution. *Martinez Rodriguez v. Jimenez,* 409 F.Supp. 582 (D.P.R.1976).

### IX

#### Isolation Cell

#### Findings of Fact

The jail has one isolation cell ("the hole") which is a small, rectangular, tiled room, completely bare except for a toilet. The only place to sit or lie is on the floor. The cell has no windows, not even in its solid metal door. There is a ceiling light fixture controlled by a switch on the outside of the cell but the cell is kept dark when occupied. The inmate is stripped of all clothing prior to being placed in the cell and is not furnished a blanket or a sheet. Inmates have been confined to the isolation cell for as many as fourteen consecutive hours. They are locked in the isolation cell for being uncooperative and/or disruptive.

It is inhumane to strip an inmate and put him (or her, for it is also used for females) in isolation of this kind; depending on the circumstances, the alternatives at the jail to placement in this cell are putting an inmate in a regular cell, separate from the general population, until he calms down, or making a disciplinary report and having a hearing before the Disciplinary Board.

### Conclusions of Law

We can find no compelling interest of the administration of the jail to justify stripping an inmate and putting the inmate nude into a darkened, bare room. The current use of the jail isolation cell deprives pretrial detainees of rights of other citizens to a greater extent than is necessary to assure their appearance at trial or to insure the security of the jail.

We acknowledge that in the interest of maintaining order and discipline, the administration may find it necessary to have a quiet cell to be used for short periods of

time, but inmates may not be placed in it in darkness and nudity.

In *United States ex rel. Walter Grandison v. Warden William Robinson, et al.* (W.D.Pa.C.A. 74–436, 1975) Judge Daniel J. Snyder, Jr. of this court held that confining the plaintiff, Grandison, to the isolation cell in this jail for twenty-four hours did not constitute cruel and unusual punishment in violation of the Eighth Amendment.

Standards relating to what may or may not constitute cruel and unusual punishment are not such that they may be applied "to any given complaint with mathematical precision." *United States ex rel. Bracey v. Rundle*, 368 F.Supp. 1186 at 1191 (E.D.Pa. 1973).

In the instant case the allegation has been made that the isolation cell, in its present state, violates the due process clause of the Fourteenth Amendment. We agree.

## X

### Staff

#### Findings of Fact

There are approximately seventy-eight officers assigned to the parts of the jail housing male prisoners. The staff consists of the warden, a deputy warden, an assistant deputy warden, three lieutenants, four sergeants, and five corporals. The remainder are classified as guards.

One block officer is in charge of each cell block. He is responsible not only for the security of the block but also for the sanitation of the block by overseeing the cleaning of the area and by making sure the cleaning supplies get to his area. Due to shortages in personnel, the block officers are not always inside their blocks; they often are temporarily assigned to another area. More guards are needed at the jail; at least two to three officers per block are necessary for adequate supervision, security and sanitation.

Lack of adequate supervision of inmates magnifies problems in this jail setting.

Many of the inmates suffer from mental problems. Two or three nurses work the 8 A.M. to 4 P.M. shift and one nurse is on duty during the evening and night shifts. No provision has been made for hiring nurses with psychiatric training. As long ago as 1975 the jail physician in a letter to the Allegheny County Board of Prison Inspectors (Exhibit 105) stated that psychiatric personnel are needed for the health and welfare of all concerned.

### Conclusions of Law

The solution of many of the problems in the jail is having an adequate number of properly trained guards on duty at all times. *Jones v. Wittenberg*, 330 F.Supp. 707 (N.D.Ohio 1971).

The inadequate number of personnel at the jail jeopardizes the security of both inmates and jail personnel. It hinders providing a jail environment which meets constitutional standards. See *Mitchell v. Untreiner*, 421 F.Supp. 886 (N.D.Fla.1976) in which the court ordered the hiring of additional personnel.

The absence of nurses trained in psychiatric care creates unnecessary problems at the jail in the handling and treatment of prisoners with mental problems.

## XI

### Counselors and Telephones

#### Findings of Fact

For several years, until June 30, 1977, there was a Federal Law Enforcement Assistance Administration (L.E.A.A.) funded counseling program for jail inmates. This program, staffed by four counselors, filled a definite need in the jail. It enabled inmates to have contact with a person whose only job was to help them with the myriad of problems faced by any inmate. A counselor sat on the Disciplinary Board (See Part VII hereof). Both the administration and the inmates felt the program was beneficial for the morale of the inmates and for the efficient running of the institution. One expert testified that a counseling program is a necessity.

One of the services provided to the inmates by the counselors entailed arranging for the use of telephones. Jail policy permits inmates to make only one telephone call. The counselors had six telephones and would arrange for inmates to make certain calls at the counselor's discretion, or they would make calls for the inmates to family members, attorneys, clergymen, physicians and bail bondsmen. These calls were not of a frivolous nature but encompassed such things as informing family members of the incarceration of the inmate, arranging for clothing and toilet articles to be brought to the jail and the like.

When the L.E.A.A. funds for the counseling program expired the County discontinued the program.

The official jail rule book states that no telephone calls are permitted. Testimony established that some calls are allowed, but in a rather haphazard, arbitrary and uneven manner. Telephone access to the outside world is good for inmate morale, helps lessen stress, helps maintain relationships, and aids in the preparation for trial.

Mr. Camp, the prison expert, testified that in his opinion telephones could easily be installed on the ranges for inmates' unmonitored use. Warden Jennings stated that telephone access is important and that the jail needs from ten to twelve lines to accommodate the needs of the inmates. Presently, the deputy warden and the sergeants try to arrange phone calls for inmates in emergency situations and attempt to act as counselors. The absence of a counseling program results in a burden on the custodial staff which uses its best efforts to render counseling service, but they are not trained in counseling, have other duties, and should not be in the position of acting as counselors.

#### Conclusions of Law

 Inmates have a constitutional right, protected by the First Amendment, to communicate with friends, relatives, attorneys, and public officials by means of visits, correspondence, and telephone calls. *Brenneman v. Madigan*, 343 F.Supp. 128

(N.D.Cal.1972). We find no justification for the administration's encroachment on such rights by strictly limiting (or prohibiting) inmates' use of telephones. Nothing in the need to detain a prisoner pending trial requires that he be thus restricted in his ability to be in telephone communication with the outside world. A number of district courts have ordered jail officials to provide inmates with access to telephones. See *Dillard v. Pitchess*, 399 F.Supp. 1225 (C.D.Cal.1975); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass. 1973), aff'd 494 F.2d 1196 (1st Cir. 1974); *Mitchell v. Untreiner*, 421 F.Supp. 886 (N.D. Fla.1976); *O'Bryan v. County of Saginaw, Michigan*, 437 F.Supp. 582 (E.D.Mich.1977).

 While the counseling program is certainly desirable, and might actually save the County money in the long run by improved prisoner morale and conduct, we recommend it but do not hold that the counseling program is a necessity which must be reinstated.

### XII

#### Law Library

#### Findings of Fact

The jail has no law library. Defendants offered testimony that in the past inmates cut up or otherwise destroyed law books which had been donated to the jail. Inmates have access to a public defender for criminal matters if the inmate meets certain minimum financial requirements. They also have access to Neighborhood Legal Services (NLS) for a limited number of civil matters.

Due to the large number of requests for legal assistance regarding high priority emergency matters, NLS cannot handle all of the requests from inmates for legal assistance.

#### Conclusions of Law

 The fundamental right of access to the courts requires that the jail authorities assist inmates in the preparation and filing of meaningful legal papers by providing

prisoners with an adequate law library or adequate assistance from persons trained in the law. *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Mitchell v. Untreiner*, 421 F.Supp. 886 (N.D.Fla.1976); *O'Bryan v. County of Saginaw, Mich.*, 437 F.Supp. 582 (E.D.Mich.1977).

Likewise, indigent inmates must be provided with paper and pen to draft legal documents, with notarial services to authenticate them and with stamps to mail them. *Bounds v. Smith, supra.*

■ The Sixth Amendment guarantees the right to the assistance of counsel. This includes the right of self-representation. A defendant in a criminal case is entitled to represent himself and may not have counsel thrust upon him by the trial court. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Because these rights are basic to our adversary system of criminal justice, they are part of the due process of law that is guaranteed criminal defendants by the Fourteenth Amendment. Self-representation requires access to legal materials and facilities. In *Cruz v. Hauck*, 515 F.2d 322 (5th Cir. 1975), *cert. den.* 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976), the court found that the fact that the prisoners were represented by counsel in criminal cases did not necessarily mean they had access to assistance of counsel for civil rights and habeas corpus actions.

■ The failure of the defendants in this case to provide those materials and facilities necessary for self-representation constitutes a violation of the Sixth and Fourteenth Amendments. *Martinez Rodriguez v. Jimenez*, 409 F.Supp. 582 (D.P.R. 1976).

The absence of a law library in the jail, and the limited assistance of persons trained in the law, result in unconstitutionally limiting the inmate's access to the courts. Vandalism by some inmates of law books does not justify depriving other inmates of their constitutional rights. The vandalism can be controlled by proper supervision.

## XIII

### Mail

#### Findings of Fact

Inmates send and receive two types of mail: legal mail, which includes mail to and from attorneys, courts, and public officials, and all other mail.

The testimony as to the handling of mail at the jail was somewhat confusing. Current jail policy both as to legal and ordinary mail appears to be that all outgoing letters (except certified letters) are deposited unsealed in jail mailboxes. This enables the administration to search the letters for contraband and to remove the inmates' coupons for postage which must be in the envelope. All incoming legal mail is opened and searched in front of an inmate (not necessarily the addressee) prior to delivery to the addressee. Incoming legal mail could be inspected in front of the addressee without any substantial administrative inconvenience. The State Correctional Institutions at Pittsburgh and Greensburg follow this procedure.

Jail policy requires that all outgoing non-legal mail be limited to one page per letter and be deposited in a jail mailbox unsealed with coupons for postage inside the envelope. This procedure insures proper postage and enables the administration to search for contraband.

Fears of threats being communicated to witnesses and communication of plans for escapes were given as the justification for censorship. All incoming non-legal mail is also opened and searched.

During the preparation for trial Neighborhood Legal Services' representatives discovered in a file in the jail some photostatic copies of legal mail of prisoners. How or why this happened was never ascertained, but it was proof that at some point in time prisoners' correspondence with their attorneys had been copied by a person or persons unknown in the jail. There was no proof that this is currently happening.

The jail has a "publisher-only" rule which prohibits inmates from receiving printed

matter from any source except a publisher. After this lawsuit was instituted, legal published material became an exception to this rule. The object of the publisher-only rule is to minimize the flow of contraband into the jail concealed in books and the like. According to defense witnesses, the jail lacks the personnel to inspect such materials received from sources other than the publisher.

The publisher-only rule results in inmates having to order from a publisher and then wait long periods of time before publications are received; since the average length of stay for an inmate is 22 days, publications ordered often arrive after the inmate has left the jail. This rule thereby results in some inmates not receiving published material.

The State Correctional Institutions at Pittsburgh and Greensburg do not have a publishers-only rule.

### Conclusions of Law

■ Pretrial detainees have the right to send or receive mail in the same fashion as other members of the general public, subject only to restrictions necessary for the preservation of jail security. *Inmates of Milwaukee Jail v. Petersen*, 353 F.Supp. 1157 (E.D.Wis.1973).

■ We find no valid interest in jail security which would justify such a limitation of inmates' First Amendment rights as the one page per letter rule, or the unsealed letter rule. It is unlikely that any contraband would be *leaving* the jail, but if it were, most of it could be detected without reading or opening the mail. *United States ex rel. Wolfish v. United States*, 428 F.Supp. 333 (S.D.N.Y.1977).

■ If an inmate should want to communicate plans for an escape or some other unlawful act, he can easily do so with a visitor, or over the telephone. Since the administration does not find it necessary to monitor visits or listen in on phone calls (See Part XIV) we find no reason for reading outgoing letters. See *Palmigiano v. Travisono*, 317 F.Supp. 776 (D.R.I.1970).

It is also obvious that a person released on bail could write to witnesses, judges, and others in a threatening or harassing manner, if he were foolish enough to want to do so. There is no reason, therefore, for the jail administration to attempt to prevent such letters from being sent by inmates; such censorship is not necessary for institutional security. See *Inmates of Milwaukee County Jail v. Petersen, supra.*

The administration does have a valid interest in preventing contraband from entering the institution. All incoming mail may be searched. However, ordinary correspondence on the part of pretrial detainees is protected from censorship as to the written content. *Inmates of Milwaukee County Jail v. Petersen, supra.*

■ No restrictions are appropriate in regard to correspondence with counsel or court officials. *Inmates of Milwaukee County Jail v. Petersen, supra.* Jail personnel may open legal mail to search for contraband in the presence of the addressee only. *Stover v. Carlson*, 413 F.Supp. 718 (D.Conn.1976). This serves to balance the right of the jail in maintaining a secure institution and the rights of the inmates guaranteed by the First and Sixth Amendments to the Constitution.

Jail personnel testified that outgoing mail must be deposited unsealed in the jail mailbox to insure that the inmates have the proper amount of coupons for postage enclosed. This procedure may contribute to the efficient handling of mail, but it is not something necessary for jail security. There are a variety of alternative procedures regarding postage which could be adopted by the administration without great inconvenience. Coupons could be attached to the outside of envelopes by a paper clip; stamps could be sold at the commissary, or money for postage could be deducted from the inmates' account at the jail.

Likewise, there is no reason to limit the length of a letter to one sheet of paper.

■ Pretrial detainees have an unqualified right to read any publication which is

legally available to members of the public generally. *Inmates of Milwaukee County Jail v. Petersen, supra.* The publishers-only rule (allowing printed matter to enter the jail only when sent directly from the publisher) interferes with this right. The task of inspecting publications for contraband is outweighed by the inmates' First Amendment rights. *Dillard v. Pitchess*, 399 F.Supp. 1225 (C.D.Cal.1975); *Inmates of Milwaukee County Jail v. Petersen, supra.*

## XIV

### Visitation

### Findings of Fact

When an inmate has a non-attorney visitor, the visitor sits in a booth facing a glass panel which separates the visitor from the inmate who sits on the other side of the panel. They communicate through an unmonitored telephone. This type of arrangement makes it impossible for inmates to have any physical contact with their visitors. Inmates are allowed to have visitors three times a week for one hour.

While some penal institutions permit "contact visits," that is visits where they can actually touch their visitor, they are not routine for detention facilities. Allowing contact visits would present a security problem at the jail. Since the jail is predominately a facility for pretrial detainees, the average inmate is in the jail for a relatively short period of time and the administration often does not have the opportunity to ascertain the history and traits of an inmate or the identity of his visitors.

Installation of metal detectors, fluoroscopes, strip search rooms, the testing of urine samples for drugs and other measures aimed at detecting the entry of contraband are standard in prison facilities where contact visits are allowed. To require these in this antiquated jail would place an undue burden on the administration. The stationing of a guard in a contact visit room could inhibit communications between inmates and their visitors. Presently, conversations between inmates and their visitors are not monitored.

### Conclusions of Law

Institutional considerations, security and related administrative problems permit reasonable limitations being placed on visits. *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

As long as there are reasonable visitation conditions, their form will remain in the province of the jail administration. In the area of prison security, much must be left to the discretion of the administration and a federal court should go no farther in a given case than constitutional necessities require. *Pell v. Procunier, supra.* We find that the visitation arrangements at the jail violate no constitutional rights of the inmates.

## XV

### Attorney Visiting Room

### Findings of Fact

In the jail attorneys visit with their clients in a carpeted, air-conditioned 15 by 25 foot room, equipped with a number of interview tables. The room is available for use at all times except when inmates are locked in their cells or are taking their meals. There are no partitions separating these tables. The jail does not have a guard on duty in the room and does not monitor conversations. The room is often crowded, which may inhibit attorney-client conversations and may interfere with the confidentiality of these conversations. Sometimes special arrangements are made for an inmate to meet with his attorney in another room.

### Conclusions of Law

We find that the attorney visiting room is sufficient to permit attorneys to consult with their clients and to properly prepare a defense. While occasionally overcrowded, this is not a constant problem. Mere speculation regarding lack of confidentiality of conversations in the room does not justify court intervention.

## XVI

### Kenneth Owens-El Case

While most of the issues raised in each of these consolidated cases are the same, the complaint filed by Kenneth Owens-El contained some allegations not found in the NLS complaint. Evidence regarding those separate issues was submitted at trial. We will deal with those issues here.

### Psychiatric Examinations

Plaintiff Owens-El alleged that pretrial detainees were involuntarily tested and classified in the Diagnostic Classification Counseling Center, with the results made available to the courts and law enforcement agencies without the consent of the inmate. At the time of trial this Center was no longer in existence.

Some inmates, however, do see a psychiatrist at the Allegheny County Behavior Clinic which is under the jurisdiction of the Allegheny County Court of Common Pleas. A Behavior Clinic psychiatrist, after referral from the court, examines specified inmates to determine an inmate's competency to stand trial and his mental condition. The results of the psychiatric examination are available *only* to the trial judge. The psychiatrist informs the inmate that he does not have to talk to the psychiatrist; an inmate is not disciplined for refusing to see the psychiatrist. We find nothing unconstitutional about this procedure.

### Commissary Prices

Owens-El alleged that the price of items sold in the jail commissary was at least thirty percent higher than prices for similar items sold at regular retail stores. We find that the commissary prices are comparable to prices at commercial drugstores. We do not find any violations of plaintiff's constitutional rights regarding commissary prices.

### Religious Services

Owens-El alleged that members of certain religious faiths are being discriminated against due to the jail's policy of locking non-participating inmates in their cells while certain religious services are being conducted at the jail. Religious counselors of a variety of faiths are available to the inmates, and the jail administers a program of religious services for the benefit of those residents who desire to participate.

The jail administration feels it is necessary to keep non-participating inmates in their cells during those services at which many attend; such inmates are not confined to their cells during other services at which fewer inmates attend. The administration's valid interest in maintaining order and security in the institution, in this instance, justifies its policy of keeping some inmates in their cells during some of the religious services.

### Arraignments

Owens-El alleged that arraignments held in the jail violated inmates' constitutional rights and offered evidence at trial regarding the arraignments. Such arraignments are conducted under the jurisdiction of the Court of Common Pleas of Allegheny County and are not the result of any procedures implemented or controlled by the defendants. Therefore, we find it unnecessary to make any findings regarding arraignments.

### Absentee Ballots

Owens-El alleged that the inmates are not informed of their right to vote by absentee ballot in national and local elections. We find that the administration posts notices regarding these rights and helps inmates requesting it to go through the procedures necessary for voting in elections.

### Medical Staff

Owens-El alleged that no nurses or physicians are at the jail after midnight. In fact, at least one nurse is on duty in the jail at all times, and the jail physician is on call twenty-four hours a day. An inmate in need of immediate medical attention can inform a guard of this fact and the guard will then inform the medical staff.

### Food and Diet

Owens-El alleged that the jail does not provide a medically appropriate diet for inmates who have diabetes. While the jail food (eaten by both inmates and guards) is not haute-cuisine, it is possible for a diabetic inmate to maintain his diet by choosing the less starchy items from those which are offered. A diabetic inmate testified that while no special meal was provided to him, he had been able to stay on his diet by being selective in the cafeteria line.

### Fingerprints

Owens-El alleged that all men, including juveniles, admitted to the jail are fingerprinted in violation of their rights. As a routine matter, the jail administration's policy is to fingerprint all new residents, including juveniles, and to send a copy of the fingerprints to county, state and federal law enforcement agencies.

This court has original jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1343. Under the doctrine of "pendent jurisdiction," or joinder of state and federal claims, we have the power to decide all of the questions presented by this case, not just the federal questions.

There is no prohibition against fingerprinting adults.

Making fingerprints of juveniles is not prohibited by the Pennsylvania Juvenile Code. 11 P.S. § 50–101 et seq. The statute does provide, however, that the law enforcement records and files concerning a juvenile must be kept separate from the records and files of adults and not available to the public. An inspection of juvenile records and files is permitted by only a limited number of people, under limited circumstances. 11 P.S. § 50–335.

There was no proof presented that the fingerprint records are being made public in violation of the Pennsylvania Juvenile Code.

### Money Damages

Plaintiff Owens-El is seeking money damages for the class he represents. In order to recover money damages under the Civil Rights Act of 1871, 42 U.S.C. § 1983, the plaintiff must show wrongful intention or culpable negligence on the part of the defendant. *Kacher v. Pittsburgh National Bank*, 545 F.2d 842 (3d Cir. 1976); *Howell v. Cataldi*, 464 F.2d 272 (3d Cir. 1972).

No evidence was presented which would permit a finding of wrongful intention or culpable negligence on the part of the defendants as is required to justify an award of money damages.

### XVII

### Conclusion

In certain instances, the constitutional rights of the inmates of the Allegheny County Jail have been violated.